## Stone, Appellant, v. Marshall Oil Company.

*Bailment—Confusion of goods—Natural gas—Fraud.*

Confusion of goods is the wilful and fraudulent intermixture of the chattels of one person with the chattels of another without the consent of the latter in such a way that they cannot be separated and distinguished. The owner who is guilty of the confusion must lose his goods.

Although such a term as "confusion of goods" is generally used, there is in fact, properly, no such doctrine as "confusion of goods." There is a fact of confusion of goods, which if committed with a fraudulent motive subjects the transaction to an inflexible rule, vigorously enforced both at

law and in equity, that the wrongdoer shall not profit by nor the innocent party suffer from the wrong. Per DEAN, J.

Where a natural gas company wilfully and fraudulently mingles gas from a leasehold with gas from other properties owned or controlled by it, and keeps no account whatever of the gas from the leasehold, although it could have easily done so, and it appears that the owner was entitled to receive from the company one fourth of the profits arising from the sale of the gas from the leasehold, the company will be bound to account to the owner for one fourth of the profits on the whole of the gas confused.

Argued Nov. 11, 1903. Appeal, No. 152, Oct. T., 1903, by plaintiff, from decree of C. P. No. 2, Allegheny Co., Oct. T., 1893, No. 132, on bill in equity, in case of C. W. Stone et al. v. Marshall Oil Company et al. Before MITCHELL, C. J., DEAN, FELL, BROWN, MESTREZAT and POTTER, JJ. Reversed.

Bill in equity for an account.

The facts are stated in the opinion of the Supreme Court.

The supplemental report of the master, J. T. Gray, Esq., was as follows :

The master has found the supplemental findings of fact and reached the conclusions hereinbelow enumerated.

### FINDINGS OF FACT.

The John Grimes well contributed 24.55 per cent of the total flow of gas into the common line, during the period between May, 1888, and February 1, 1898, the time during which the gas from the John Grimes well was intermingled with the gas from the several other wells, to wit: W. N. Bebout No. 1; W. A. and A. W. Kerr No. 1; W. A. and A. W. Kerr No. 2; W. A. Carothers; John W. Stewart; William Prigg; Chartiers Oil Company (Knox) ; Samuel Wright; Mehaffey heirs No. 1; Mehaffey heirs No. 2; J. D. Campsey; W. C. Grimes; W. C. Grimes No. 2; McLain and Campsey; G. T. Werk; W. N. Bebout No. 2, John Sawhill, and Samuel Roney ; and the aforesaid wells, other than the John Grimes well, contributed, during the same time, 75.45 per cent of the total gas conducted into the common line and intermingled with the gas contributed by the said John Grimes well.

### CONCLUSIONS OF LAW.

We are of the opinion that the additional evidence offered by

the defendants has not thrown any additional light upon the questions involved, nor aided the master in determining, with any degree of accuracy, or even approximately, the amount of gas contributed by the John Grimes well and the several other wells, during the period of time from May, 1888, until February 1, 1898, during which the defendants negligently intermingled the gas from the Grimes well with the gases from the other wells, without making any effort to ascertain the proportions contributed by the several wells; and therefore reaffirm the findings of fact and conclusions of law set forth in the report heretofore filed; but, in view of the directions of the court, that the doctrine of confusion of goods, or analogous principle, is not to be applied, and that "equity requires, not that the defendants should be charged with the whole product of all the wells, because by their default the product of the Grimes well cannot be accurately measured, but that the amount of gas produced by the Grimes well and by the others should be arrived at approximately, as closely as the evidence now attainable will allow, giving to the plaintiffs the benefit of all reasonable doubts arising out of the want of evidence caused by the defendants' default," we have endeavored to apply such directions to the consideration of the case, and find that the plaintiffs are entitled to have and receive from the defendants, the Washington Oil Company and the Taylorstown Natural Gas Company, one fourth of the profits derived from the sale of gas from the John Grimes well, from May, 1888, to February 1, 1898, plus interest from February 1, 1898, to January 1, 1899, and one fourth of the profits of the sale of gas discovered and conducted from the Grimes lease from February 1, 1898, the date of the separation of the gas of the Grimes well and the several other wells, amounting to $27,800.76, with interest from February 1, 1899, attached hereto being a statement in detail.

In ascertaining and determining the profits of the sale of gas from the John Grimes well from May, 1888, to February 1, 1898, we have found the percentage of gas contributed by the John Grimes well to the general line into which the gas from all the wells was conducted, to be 24.55 per cent of the total amount of gas. In arriving at the percentage of 24.55, we have taken the testimony of Mr. Scheneller. He, basing

his estimate on the minute pressure, estimated that.the amount of gas contributed by the John Grimes well would be eighteen per cent; on the two minute pressure, nineteen per cent; on the three minute pressure, seventeen per cent; on the four minute pressure, 16.9 per cent, and on the five minute pressure, 13.8 per cent and bearing in mind the direction of the court to give plaintiffs the benefit of all reasonable doubt arising out of the want of evidence, caused by the defendant's default, we have taken as the basis, the highest percentage, to wit: nineteen per cent, on the two minute pressure, and in view of the further testimony of Mr. Scheneller, showing that the average one minute pressure was 323 pounds plus, instead of 250 pounds, upon which pressure he made his calculations, and that the average pressures for two minutes, three minutes and five minutes, were arrived at in the same way, we have added the difference between the result obtainable on the basis of an average pressure of 250 pounds, and an average pressure of 323 pounds plus, to wit: 5.55 per cent, to the nineteen per cent, making a total of 24.55 per cent.

*Error assigned* was decree affirming master's supplemental report.

A. *Leo. Weil* and *J. W. Lee,* with them *John Chapman, R. B. Stone* and *Charles M. Thorp,* for appellants.—The rule as to confusion of goods is applicable to this case: Diversey v. Johnson, 93 Ill. 547; Graham v. Plate, 40 Cal. 593; Callaghan v. Myers, 128 U. S. 617 (9 Sup. Ct. Repr. 177); Elizabeth v. Pavement Co., 97 U. S. 126.

The Pennsylvania cases on the subject of confusion of goods are as follows: Henderson v. Lauck, 21 Pa. 359; McDowell v. Rissell, 37 Pa. 164; Kleppner v. Lemon, 197 Pa. 430; Kleppner v. Lemon, 198 Pa. 581.

*Johns McCleave,* with him *R. W. Cummins,* for appellee.—The gas of the Grimes well was mingled with that of other wells under the bona fide claim on the part of the appellees of title to the well, and the decree upon the hearing for an accounting affirmed the appellee's title, being based expressly upon the theory that the appellees were sublessees of the appellant. But

even if the appellees had no title whatever to the Grimes well, —if the gas were mingled with the gas from the other wells under the belief that they owned the well, a forfeiture of the mass would not take place, but the appellees, under all the decisions, would be allowed to prove their proportion as nearly as this could be done : Hesseltine v. Stockwell, 30 Me. 237 ; Gates v. Rifle Boom Co., 70 Mich. 309 (38 N. W. Repr. 245) ; Pratt v. Bryant, 20 Vt. 333 ; Osborne & Co. v. Cargill Elevator Co., 62 Minn. 400 (64 N. W. Repr. 1135) ; Stone v. Quaal, 36 Minn. 46 (29 N. W. Repr. 326) ; Pickering v. Moore, 31 L. R. A. 698 ; The Idaho, 93 U. S. 575 ; Claflin v. Continental Jersey Works, 85 Ga. 27 (11 S. E. Repr. 721) ; Bent v. Hoxie, 90 Wis. 625 (64 N. W. Repr. 426) ; Young v. Miles, 20 Wis. 615 ; Reid v. King, 89 Ky. 388 (12 S. W. Repr. 772) ; Kaufmann v. Schilling, 58 Mo. 218..

OPINION BY MR. JUSTICE DEAN, January 4, 1904:

Akin, one of the plaintiffs, on November 13, 1885, leased from Grimes the oil and gas under the latter's 150-acre farm in Washington county, for the term of three years or as long as oil and gas should be found in paying quantities. Akin as a consideration was to give one eighth the oil if oil were found, and in case gas was struck in paying quantities, was to pay Grimes $700 annually for each well. One well was to be completed within a year, and Akin was to pay $150 annually in quarterly payments until a well was completed ; the lease was acknowledged and recorded July 22, 1886. On December 2, 1886, Akin assigned one half his lease to C. W. Stone, R. B. Stone and A. J. Hazeltine, the other three plaintiffs to this suit ; this assignment was recorded the same day. They drilled no well but made the quarterly payments to Grimes who accepted them. On August 19, 1887, they executed a lease of fifty acres of the farm to the Marshall Oil Company, subject to all the stipulations of the original lease from Grimes to Akin, all of which stipulations were to be kept and performed by the oil company. The oil company was to have the right to drill and operate for oil and gas for one year and as much longer as oil and gas should be found in paying quantities ; the company was to drill four wells, to be completed within four, eight, twelve and sixteen months respectively.

Part of the consideration is embodied in this provision: " The said party of the second part (the oil company) for itself, its successors and assigns agrees to give to said parties of the first part (Akin, Stones & Hazeltine), one fourth of all petroleum, one eighth to credit of John Grimes and one eighth to the lessors of this lease. It is also agreed that in case gas shall be discovered and conducted off the premises for use or sale, the said parties of the first part in the proportionate interests aforesaid shall receive one fourth of the profits thereof above cost bonus of $700 to the original lessor." This lease is dated August 19, 1887, and was recorded the next day. On December 25, 1887, this lease was supplemented by another of thirty acres more of the farm on the same terms, but providing that of the four wells, none of which had yet been drilled, two should be completed within four months, one on the fifty-acre tract and one on the thirty-acre tract, and that as to all oil or gas produced on either tract the royalty should be the same as that fixed for the fifty acres. The Marshall Oil Company then drilled one well, a very strong gas well; the Marshall Oil Company did not utilize it itself, but sold it to the Washington Oil Company, another of defendants. Then on June 19, 1888, the Marshall Oil Company induced Grimes to lease to it directly, the whole farm for oil and gas purposes. The terms of the lease were substantially the same, as those in the lease from Grimes to Akin except, that instead of $700 per annum, the price for each gas well was to be $600, but the price for the well completed was to remain $700. Then by a separate agreement Grimes reduced the price per well to $500. Then by agreement dated July 5, 1888, the Marshall Oil Company leased an additional fifteen acres to the Washington Oil Company subject to the same terms as its first lease to the same company dated the previous June. The Washington Oil Company tubed the first well, piped the gas and sold it from August, 1888, to September, 1889, then by bill of sale transferred the gas to the Taylorstown Natural Gas Company which has been disposing of it ever since. This last company was, practically, a selling company for the Washington Oil Company. This first well was a remarkably strong and productive well; even after nine years there is no perceptible diminution in the pressure or in the volume of gas.

After its contract with Grimes of June 19, 1888, the Marshall Oil Company and Washington Oil Company drilled other wells on the Grimes farm and the gas from them, as well as from the first well drilled, was conducted into a main pipe and from that pipe conducted and distributed to consumers who desired to purchase it. The defendants refused to account to plaintiffs for their share of the profits of the Grimes well and this bill was filled in July, 1893, for discovery and for an account and decree of their share of the profits of that well.

Defendants set up defense that the lease from Grimes to Akin and from the latter to the Stones and Hazeltine were not the subject of assignment; that the covenant for share of the profits was a mere personal covenant of the Marshall Oil Company and not binding on its assignees; that there had been default in payment to Grimes which avoided the lease, and that plaintiffs had an adequate remedy at law.

The late Judge WHITE, then sitting as chancellor, after a full hearing on the evidence, in an elaborate opinion filed, decreed in February, 1898, that defendant should account and sent the case to a master to state an account of the profits of the Grimes well. From this decree defendants appealed and it was affirmed by this court on the opinion of the court below November 14, 1898, and now after five years more with many and prolonged hearings before the master and the court below, we have this appeal by plaintiffs. Judge WHITE, in his opinion decreeing the accounting, held that " it was very evident that the Marshall Oil Company in procuring the lease from Grimes (of the whole farm) June 19, 1888, acted in bad faith and was guilty of a legal fraud upon the plaintiffs," and that this was for two purposes, one to get clear of drilling another well, and second to get clear of paying to plaintiffs the share of one fourth of the profits on sale of gas. He further held: " A share of the gas stands on the same footing as a share of the oil. A share of the oil may be delivered at the well or in pipe lines ; as a share of gas could not be delivered in specie at the well or elsewhere, the only way of sharing it would be to share in the proceeds of sale."

The master then, very properly, brushed aside much of the rubbish brought into the case by defendants to shield them from fully accounting, and as he was bound to do, treated two

questions as res adjudicata first, defendants were bound to account for one fourth the profits from the Grimes gas well; second, to get at their share of the profits they were bound to show with approximate accuracy, plaintiffs' money share of the profits by showing the quantity of gas produced from that well. But defendants alleged the gas from the Grimes well was indiscriminately blended and mixed by defendants with that from a number of other wells of theirs and it is impossible now to tell the quantity received from that particular well. As to this plea the master answers : " It is true they admit they were unable to determine with accuracy how much gas came from the Grimes well, but they say, having failed to keep such account what more can we do than we have done ? This might answer very well if they had innocently erred, but if the failure to keep an account is not the result of innocent error but of a fixed purpose to secure for themselves the profits of the Grimes lease, the case is a very different one. The testimony discloses the fact that the defendant companies have acted with their eyes open and with full knowledge of the claim of plaintiffs to one fourth the profits from the sale of gas from the Grimes well."

The master might very well find that they had acted with their eyes open ; not only were the lease to Akin and the assignment of half interest by him to the other three plaintiffs before them, but they had actual notice from R. B. Stone of plaintiffs' contract and claim of right under it. In 1893 this bill was filed, yet no attempt for nearly ten years was made to keep any account of this particular well. The master finds, that there was a well known system of measurement which might, with but little trouble have been adopted and approximate accuracy of quantity obtained. Having made no effort to keep an account, with a full knowledge of their moral and legal obligation, they mingled the production of this well with their other wells so that it is now impossible to ascertain, with even approximate certainty, the quantity. That it was very large, that it was in volume persistent and under high pressure, is not questioned.

The master having stated the fact of the confusion of plaintiffs' property with that of defendants and the fraudulent purpose in defendants' conduct, and after finding as a fact from

the evidence that it was impossible to separate with even
approximate accuracy as to quantity the product of the Grimes
well from the product of defendants' other wells, finds, that in
law there was by defendants a confusion of goods and to the
end that he might award to plaintiffs their one fourth share of
the profits under this contract he adopts the definition of
" confusion of goods " given in Dwight on Persons and Per-
sonal Property, 486, as his rule of action.    That definition is as
follows :  " Confusion of goods as understood in English and
American law, is the wilful and fraudulent intermixture of the
chattels of one person with the chattels of the other, without the
consent of the latter in such a way, that they cannot be sepa-
rated and distinguished."    The master fortifies the accuracy
and scope of this definition by a citation of unimpeachable
authorities.    In fact, there is no substantial distinction between
his definition and that cited by appellees' counsel from Suther-
land on Damages, sec. 101 :  " A reasonable rule which has
much authority to support it, is, that one who has confused his
own property with that of other persons shall lose it when
there is a concurrence of these two things : first, that he has
fraudulently caused the confusion, and secondly, that the rights
of the other party after the confusion are not capable other-
wise of complete protection."    Taking the facts as found by
the master, there is no distinction in the applicability of either
definition.    So the master governed by this rule stated an
account, charging the defendants with the gross receipts of
gas, from October, 1888, to February, 1898, $549,544.03 and
allowing them credit for expenses and other items which
reduced the amount to $451,861.22 ;  one fourth of this or
$112,965.30 he awarded to plaintiffs as their share of profits
and submitted his report accordingly to the court.    In the
meantime Judge WHITE, who had heard the evidence at the
first hearings, and who had adjudged the liability of defendants
to account and had appointed the master, died, so exceptions
to the report were heard and passed upon by Judge SHAFER,
who decreed in opinion filed, that the exceptions denying the
application of the doctrine of the confusion of goods be sus-
tained, and that the case be referred back to the master that
he might state an account in accordance with that opinion.
Accordingly, the master with great reluctance restated the

account as directed by the court making the receipts from the Grimes well $111,203.05, and one fourth of that sum, $27,800.76, he awarded to plaintiffs. That statement of account the court confirmed absolutely, and we have this appeal by plaintiffs assigning for error the change in the computation as directed by the court.

The reasons given by the learned judge, for setting aside the account stated by the master, do not convince us that his decree is correct. He says : " Upon a careful examination of the authorities cited by counsel we are convinced that the doctrine of confusion of goods is not applicable to the facts of this case." Then, after stating the substance of the contracts on which the claim of plaintiffs is based, he further says :

" The default of the defendants consists not in mingling the goods of the plaintiffs with their own, but in failing to keep a proper account of the proceeds of the Grimes well so as to be able to show definitely, the amount of profit derived therefrom by them. The well and the gas produced from it being entirely in their own hands and control, and plaintiffs having no means whatever of keeping any account, the duty devolved upon the defendants to keep an account, and their agreement to pay to the plaintiffs the one fourth of the profits implied an agreement to keep a reasonably definite and accurate account.

" While we are of opinion that the doctrine of confusion of goods is not to be applied so as to deprive them of the profits of one fourth of all the gas produced from the other eighteen wells owned by them, yet the fact that negligence or fraud of the defendants has made a determination of the exact product of the Grimes well difficult and perhaps impossible, must certainly be deemed to cast on them the inconvenience and loss which may arise from the difficulties of the account, and not on the plaintiffs who are not to blame for them."

We are at a loss to see any practical distinction between the reasons for the rule adopted from the books by the master and the reasons for the one announced by the court ; nor can we see any other rational method that could be adopted by the master which would certainly reach none other than a righteous result.

There is but little difference between the master and the court in the moral stamp put upon the conduct of the de-

fendants, but a very wide difference in the result of the two computations; by discarding his own computation in his first report and adopting the court's in the second, he relieves defendants of three fourths of the award he first imposed upon them. But in the second he treats defendants exactly as equity would have treated them, if from the beginning there had been a mutual agreement that the product of the Grimes well should not be measured before it passed into the main, that then, for years it might be commingled with the gas from the other wells, and then with no means of approximating certainty, the plaintiffs' share of the profits should be computed. This is what equity would have done if both parties had been equally innocent, or rather, if both had been equally negligent. But the adoption of the court's method flatly ignores the facts found by the master and from which the court does not dissent: the gas was commingled by the fraud of defendants; in defiance of plaintiffs' right which they well knew, they wholly neglected to keep any account of it. The master finds now, that it is utterly impossible to approximate the quantity; therefore, obeying the peremptory instruction of the court, as was his duty, he could not do other than make a somewhat arbitrary estimate or guess at the quantity and so report. In doing so, he disregards the facts, which the law declares would impel him to adopt the principle on which his first report is founded and, therefore, the second report is not founded on fact or reason. By the guessing method, the chances of loss or gain between the innocent plaintiffs and the culpable defendants are even. By adopting the court's method it is just as probable that defendants will gain thousands of dollars worth of plaintiffs' gas to which they have no right as that plaintiffs will get any part of the gas to which they have no right. This is the very situation, that arouses the indignation of equity, for plaintiffs did nothing to bring it about and defendants did; hence, comes into operation the principle that the wrongdoer shall not profit by his wrong and the innocent party shall not suffer by it.

The principal reason given by the learned judge for not adopting the first report of the master, is, that he misapplies to the facts before him, the doctrine of confusion of goods, because the plaintiffs had no property in the gas as a product or

chattel but only a right to one fourth the profits on the sale of it. It is clear to us that this is too narrow a view of the power and functions of either law or equity; it taints them with an imbecility which would render them powerless in many cases to remedy wrongs or vindicate rights. Although such a term as " confusion of goods " is generally used, there is, in fact, properly, no such doctrine as a " confusion of goods ; " there is a fact of confusion of goods, which if committed with a fraudulent motive, subjects the transaction to an inflexible rule, rigorously enforced both at law and in equity, that the wrongdoer shall not profit by nor the innocent party suffer from the wrong. It would be impossible in reaching a righteous result, that any one particular method should be adaptable to the innumerable and complex transactions of the business world, or exactly to all the devices and devious ways of fraud.

Substantially, a like method is adopted with the same result in settling the accounts of negligent and faithless trustees, who have kept no accounts or have mixed indiscriminately the trust funds with their own; equity does not fear wrong to the culpable trustee, but so shapes its decrees that no possible wrong shall come to the innocent cestui qui trust. The same principle is applied to the wilful trespasser, who has mixed his own ore or his own logs with those of his innocent neighbor. And as in Kleppner v. Lemon, 197 Pa. 430, the case of a wrongdoer who commingled the oil from his own land with that of an owner from whom he leased and wilfully neglected to keep account of the respective products. Indeed, we can see no room for distinction in the application of the principle between the Kleppner case and the one before us. Kleppner by his contract was entitled to a royalty of one eighth the oil from one well on his own land ; the lessee had other wells on adjoining lands, then fraudulently commingled the oil from all of them and kept no account of that from Kleppner's ; it was held that Kleppner was entitled to one eighth of the whole.

The definitions heretofore quoted, happen to have had in view a fraudulent commingling of chattels having a separate individuality, which might have been preserved if proper care had been taken and accounts kept by him on whom was imposed such duty, so that afterwards on settlement or adjustment, the

value of each one's share of the chattels could readily be ascer-
tained according to the number of cattle, tons of ore, or gallons
of oil.   If the chattels be wilfully and fraudulently commingled,
no accounts kept or other means of determining each one's
share, there comes into operation the principle applicable to all
transactions affected by fraud, that the wrongdoer shall not
profit nor the innocent party suffer by the fraud.   And the more
difficult it is, from the nature or species of the chattel, to pre-
serve the property right of the owner, the more imperative is
the duty upon him who is answerable, to preserve to the extent
that he is able, the evidence of the right.   It makes no differ-
ence in the application of the principle that plaintiffs were en-
titled to one fourth the profits of the Grimes well instead of to
one fourth the gas.   Defendants' motive in first attempting the
fraud was to get rid of paying one fourth the profits of the
product; then, with distinct knowledge of, and actual notice
of, plaintiffs' claim, even by suit, they effectually smothered any
certain evidence of the extent of their answerability by neglect-
ing to keep accounts.   Their only defense now is, we have no
accounts, and as the master practically finds, they resort to
guessing to determine the quantity of gas from the Grimes well.
The argument of appellees' counsel, to some extent approved
by the court below, is, that by their contract they acquired title
to the gas and therefore had a right to commingle it with their
own.   This argument evades the point at issue; the whole of
the gas was in their control and custody; by their relation to
the contract and to plaintiffs, it was their moral and legal duty
to account to, and pay to the plaintiffs one fourth the profits.
They wilfully neglected to keep accounts showing, even approx-
imately, the extent of their liability, and now ask, after putting
it out of their power to account, leave to guess at the amount
payable to plaintiffs.

We think the facts that the entire product was by the con-
tract the property of defendants, and that their responsibility
consisted only in their duty to account for and pay over one
fourth the profits does not relieve their conduct from the ap-
plication of the same principle as is applied to a fraudulent con-
fusion of goods.

Therefore the decree of the court setting aside the first report
of the master is reversed; the second report is set aside and the

decree affirming it reversed; the appeal of J. B. Akin, C. W. Stone, R. B. Stone and A. J. Hazeltine is sustained and the first report of the master is confirmed absolutely.