J-A35043-14

2015 PA Super 93

| EARL KENNEDY, ELIZABETH KENNEDY, CHARLES G. ELY, II, JAMES SISLEY, JOANNA STORER, JOHN O. HARKER, AND THE EARL KENNEDY TRUST, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellants | |
| v. | |
| CONSOL ENERGY INC., A DELAWARE CORPORATION AND CNX GAS COMPANY, LLC, A VIRGINIA LIMITED LIABILITY COMPANY, | |
| Appellees | No. 514 WDA 2014 |

Appeal from the Order February 26, 2014
In the Court of Common Pleas of Greene County
Civil Division at No(s): 225 of 2007

BEFORE:  BENDER, P.J.E., BOWES, and ALLEN, JJ.

OPINION BY BOWES, J.:                    **FILED APRIL 22, 2015**

This is an appeal challenging multiple orders and a judgment entered following a non-jury verdict that disposed of claims asserted by Earl Kennedy, Elizabeth Kennedy, Charles G. Ely, II, James Sisley, Joanna Storer, John O. Harker, and the Earl Kennedy Trust ("the Kennedys") in piecemeal fashion.  The Kennedys are the owners of oil and gas rights in a 790-acre tract of land in Gilmore Township, Greene County, which was owned in fee at one time by James L. Garrison.  Consol Energy Inc. is the owner of the Pittsburgh coal seam under that tract, and CNX Gas Company drilled wells and extracted coalbed methane gas from that seam for Consol (collectively

"Consol"). The Kennedys challenge the trial court's grant of judgment on the pleadings in favor of Consol on the count seeking to quiet title to coalbed methane gas in the Pittsburgh seam; judgment in favor of Consol following a bench trial in a second quiet title action to coalbed methane gas in the Rider seam; and summary judgment for Consol on their claims for trespass, conversion, unjust enrichment, and replevin stemming from Consol's alleged intrusion into adjacent strata owned by the Kennedys during its degasification of the Pittsburgh coal seam in preparation for mining. After thorough review, we affirm.

In a January 14, 1932 deed, some of the heirs of Mr. Garrison, who are predecessors in title to the Kennedys, conveyed their interest in the property to other heirs, but excepted and reserved the coal of the Pittsburgh or River vein in and beneath that tract, and "all of the oil and gas in place" underlying the property. Those reservations provided:

> EXCEPTING AND RESERVING, however, from this conveyance . . . all the coal of the Pittsburgh or River vein in and beneath said tract of land, TOGETHER with the free, uninterrupted use and enjoyment of right of way into and under said lands at such points and in such manner as may be considered proper and necessary for the advantageous and economical operation thereof, and in the digging, mining, ventilating, draining and carrying away said coal and without liability therefor, the grantees also waiving any and all damages that arise therefrom to the surface, or to anything therein or thereon by reason of such digging, mining, ventilating, draining, and transporting of the said coal . . .
>
> AND ALSO EXCEPTING AND RESERVING to . . . all the oil and gas in place in and under said lands . . . and also with the oil and gas in place there is hereby reserved the exclusive right to

lease any part or all of said lands for the purpose of drilling and operating thereon for natural gas and petroleum oil, and also the right to construct and maintain pipe lines, gates and drips for the transportation of oil or gas produced therefrom, and with the right to use sufficient water for all operations thereon and the right of ingress and egress . . .

Deed, 1/14/1932, at 2-3.

In 1961, by a series of deeds, the Kennedys' predecessors in title conveyed their interests in "all of the coal in the Pittsburgh or River vein in and beneath" the tract to Consol,

TOGETHER with the free, uninterrupted use and enjoyment of right of way into and under said lands at such points and in such manner as may be considered proper and necessary for the advantageous and economical operation thereof, and in the diffing, mining, ventilating, draining and carrying away said coal and without liability therefore, . . .

BEING the same interest in said tract of coal and mining rights which was reserved . . . in deed . . . dated January 14, 1932.

1961 Deed[1] at 2. Thus, after 1961, the Kennedys remained the owners of "all of the oil and gas in place" in the subject property, but Consol owned the coal in the Pittsburgh seam.[2]

Present in the coal itself is coalbed methane gas, a highly combustible gas that must be ventilated during the coal mining process to prevent

---

[1] A series of deeds were executed conveying the interests in the Pittsburgh or River Vein of coal to Consol. Since all contain the same language regarding the coal and the reservation of oil and gas rights, we simply refer to the deeds collectively as the 1961 Deed.

[2] The record establishes that some of the Plaintiffs own the surface of the subject property.

explosion or inhalation. Formerly the practice was to vent the gas into the atmosphere. More recently, coalbed gas has proved to be commercially marketable, and hence, valuable. Consequently, wells are drilled to extract coalbed methane gas from the coal, a process called degasification. Degasification is undertaken prior to the mining of coal to prevent explosions in the mine, and the goal is remove fifty to eighty percent of the coalbed methane.

In 2005, in order to degas the Pittsburgh seam underlying the subject property, Consol drilled a series of vertical production wells to a depth of several hundred feet below that coal seam, four of which are at issue herein. They then drilled access wells nearby and angled them so that they would be approximately horizontal as they entered the coalbed. At some point, the horizontal leg of the well intersected the vertical production well. Additional sidetracks of the horizontal well (horizontal legs) were drilled, and they also flowed to the production well. The access well was then sealed and gas flowed from the laterals to the production well.

The Pittsburgh coal seam has undulations and waves. The record reveals that drillers used gamma radiation to guide drill bits into the seam. Low readings indicated that the drill bit was located in the coal; higher readings meant that the bit was approaching or located in clay or shale. The driller had the ability to adjust the drill in the direction of the lower reading,

presumably into the coal, where the highest levels of coalbed methane gas were located.

In 2007, the Kennedys filed a multi-count complaint seeking, *inter alia*, quiet title to the ownership of the coalbed methane gas in the Pittsburgh or River veins under the subject tract. The trial court applied **United States Steel Corp. v. Hoge**, 468 A.2d 1380 (Pa. 1983), and concluded that Consol owned the coalbed methane gas, and granted judgment on the pleadings in favor of Consol in the quiet title claim regarding the coalbed methane gas ownership. After a non-jury trial on the quiet title claim relative to the Pittsburgh Rider seam, the trial court ruled against the Kennedys based on a lack of proof that the Rider seam was located under the Kennedys' property. Finally, summary judgment was granted in favor of Consol on the trespass and conversion counts. The court determined that the Kennedys failed to adduce sufficient evidence to raise genuine issues of material fact for the jury that Consol, without privilege to do so, intentionally or willfully trespassed into their strata and converted their gas and minerals. Although one quiet title claim remained regarding ownership of surface acreage, the Kennedys discontinued that claim in order to perfect the instant appeals.

The Kennedys present three questions for our review:

1. Did the Trial Court commit an error of law when, entering judgment on the pleadings, it conducted an inadequate review of the deeds that clearly severed the coalbed methane gas from the coal of the Pittsburgh or River vein based on its

- 5 -

incorrect application of **United States Steel Corporation v. Hoge** for the rule that the owner always owns coalbed methane gas in the coal?

2. Did the Trial Court commit an error of law when it noted substantial questions of material fact in the record but entered summary judgment based on its own determination of the facts?

3. Did the Trial Court commit an error of law when that [sic] it construed a deed conveying the "Pittsburgh or River vein" of coal to also convey a separate seam known as the Pittsburgh Rider seam?

Appellants' brief at 6.

The Kennedys contend that the trial court erred in relying upon **Hoge** in granting judgment on the pleadings in favor of Consol in the quiet title action involving ownership of the coalbed methane gas. The law is well settled that

> Entry of judgment on the pleadings is appropriate "when there are no disputed issues of fact and the moving party is entitled to judgment as a matter of law." **Consolidation Coal Co. v. White**, 2005 PA Super 155, 875 A.2d 318, 325 (Pa. Super. 2005). Our scope of review is plenary and we will reverse only if the trial court committed a clear error of law or if the pleadings disclose facts that should be submitted to a trier of fact. **Id**. "We accept as true all well-pleaded allegations in the complaint." **Id**.

**Sisson v. Stanley**, 2015 PA Super 18 (Pa.Super. 2015).

The **Hoge** case is pertinent herein. In **Hoge**, U.S. Steel, the owner of coal rights pursuant to a 1920 coal severance deed, commenced an action against the lessee of the oil and gas rights who began drilling wells in 1978 to recover coalbed methane gas. U.S. Steel maintained that, as the owner

of the coalbed, it owned the coalbed methane gas. The issue before the trial court in **Hoge**, as herein, was who owned the coalbed methane gas: the party who possessed the oil and gas rights or the owner of the coal.

In making its determination, the **Hoge** trial court construed the July 23, 1920 coal severance deed to glean the intentions of the parties. That deed conveyed the coal rights to U.S. Steel, together with the right to ventilate, but reserved to the surface owners the "right to drill and operate through said coal for oil and gas without being held liable for any damages." **Hoge**, **supra** at 1383. The deed made no mention of coalbed methane. The court noted that at the time of the execution of the deed, coalbed methane gas was not commercially marketable and was regarded as a nuisance. Furthermore, in addition to the grantor's reservation of an estate in "oil and gas," the grantor also reserved the right to drill through the coal seam to access the gas. Since natural gas was contained in strata below the coal seam, the trial court construed the reservation of oil and gas as encompassing oil and natural gas only. Based on the conditions existing at the time of the conveyance, the court concluded that the grantor conveyed the coalbed methane gas with the coal in which it was present.

The Superior Court reversed, but the Supreme Court affirmed the trial court, holding:

> [A]s a general rule, subterranean gas is owned by whoever has title to the property in which the gas is resting. When a landowner conveys a portion of his property, in this instance coal, to another, it cannot thereafter be said that the property

- 7 -

> conveyed remains as part of the former's land, since title to the severed property rests solely in the grantee. In accordance with the foregoing principles governing gas ownership, therefore, such gas as is present in coal must necessarily belong to the owner of the coal, so long as it remains within his property and subject to his exclusive dominion and control. The landowner, of course, has title to the property surrounding the coal, and owns such of the coal bed gas as migrates into the surrounding property.

*Hoge*, *supra* at 1383 (internal citations omitted) (emphasis in original).

The Kennedys argue that the facts herein are distinguishable from those in *Hoge* and that the trial court incorrectly applied *Hoge* as a universal rule that the coal owner always owns the gas in the coal. Instead, they maintain that the trial court should have examined the deeds to determine the intent of the parties as the *Hoge* Court did. Had it done so, the Kennedys contend, the court would have interpreted the reservation in the 1932 deed for "all of oil and gas in place," as just that, all of the gas, including the coalbed methane gas in the Pittsburgh or River vein. Consequently, when their predecessors conveyed the coal to Consol by deed in 1961, again reserving "all of the oil and gas in place," they did not convey the coalbed methane gas.

Consol relies on *Hoge* as definitively establishing that the owner of the coal is also the owner of the coalbed methane gas in Pennsylvania and represents that the recent Supreme Court decision in *Butler v. Charles Powers Estate ex rel. Warren*, 65 A.3d 885, 893 (Pa. 2013), affirmed that

rule.[3]  Consol contends further that, even if we examine the deeds as the

Kennedys advocate, the result is the same.  In support of its position, Consol

points to language in the 1961 deed granting it the right of way to enter the

land in any manner "proper and necessary for the advantageous and

economical operation thereof," and specifically, the right to ventilate.  The

same language is contained in the 1932 deed.  According to Consol, this

language is even broader than the language in the *Hoge* coal severance

deed because it recognizes Consol's right to "advantageous and economic

operations" of its coal rights.  Since the Kennedys' predecessors did not

perceive coalbed methane as a valuable resource, Consol submits they did

not expressly reserve a right to it for the reasons advanced in *Hoge*.  Consol

concludes that since Appellants' predecessors did not expressly reserve and

except the coalbed methane when they conveyed the coal to Consol's

---

[3] We do not agree with Consol's view of ***United States Steel Corp. v. Hoge***, 468 A.2d 1380 (Pa. 1983), as a hard and fast rule.  Furthermore, in ***Butler v. Charles Powers Estate ex rel. Warren***, 65 A.3d 885, 893 (Pa. 2013), the Supreme Court construed a reservation of the rights in subsurface minerals and petroleum oil in an 1881 deed as not contemplating the natural gas contained in the Marcellus shale.  The ***Butler*** Court reaffirmed the ***Dunham*** Rule, *i.e.*, that a deed reservation of minerals does not contemplate or include natural gas unless it is expressly stated therein or unless there is clear and convincing evidence presented that the parties intended, at the time of the conveyance, to include natural gas.  The Court distinguished ***Hoge*** based on the unique qualities of coalbed methane gas that made it unlikely that one would intentionally reserve what was then perceived as a valueless gas, and the reservation in the deed of the right to drill through the coal to the oil and gas below.

predecessor, there was no intent to retain that gas, and Consol owns exclusive title to the coalbed methane in the Pittsburgh seam.

The Kennedys counter that, if their predecessors intended to convey the methane gas with the coal, there would have been no need to convey the right to ventilate the gas in the coal. Appellants' brief at 23. "Undoubtedly," the Kennedys argue, the methane gas was severed from the coal in the 1932 deed. *Id*. at 29. Additionally, the Kennedys attempt to distinguish *Hoge* on the basis that it was a first conveyance case, *i.e.*, the coal severance deed was the first conveyance of an interest in the property, rather than the second conveyance case such as the one here.

The record reveals the following. In 1932, the Kennedys' predecessors excepted

> "all the coal of the Pittsburgh or River vein in and beneath said tract of land, TOGETHER with **the free, uninterrupted use and enjoyment of right of way into and under said lands at such points and in such manner as may be considered proper and necessary for the advantageous and economical operation thereof**, and in the digging, mining, **ventilating**, draining and carrying away said coal and without liability therefore."

1932 Deed, at 1. (emphasis supplied). They also excepted and reserved "all the oil and gas in place" and "the exclusive right to lease any part or all of said lands for the purpose of drilling and operating thereon for natural gas and petroleum oil, and also the right to construct and maintain pipe lines, gates and drips for the transportation of oil or gas produced therefrom . . ." *Id*. Thus, in 1932, ownership of the coal estate and the oil and gas estate,

- 10 -

while severed from ownership of the surface and subdivided into two estates, resided in the same grantees. In the 1961 Deed, ownership of the coal estate was conveyed to Consol's predecessors.

We read **Hoge** as establishing the general rule that, when a coal severance deed is silent as to ownership of the coalbed methane, or does not expressly reserve coalbed methane from the coal conveyance or specifically define coalbed methane as a gas, the coalbed methane gas contained in the coal belongs to the owner of the coal. It is not a *per se* rule as Consol suggests. Nonetheless, we find the **Hoge** Court's reasoning applicable on the facts herein.

In 1932, the Kennedys' predecessors conveyed the property but subdivided and reserved the coal estate and the estate for "all the oil and gas in place in and under said lands." With the oil and gas, they "reserved the exclusive right to lease any part or all of said lands for the purpose of drilling and operating thereon for **natural gas** and **petroleum oil** . . . ." (emphases added). There was no mention of coalbed methane gas in the deed; the only gas referenced in the oil and gas reservation was natural gas. Since coalbed methane was explosive and perceived as a nuisance at the time, the circumstances made it highly improbable that one would retain rights to coalbed methane gas. This construction of the deed is buttressed by the fact that the grantors in 1932 did not reserve the right to lease the land for the purpose of drilling for coalbed methane gas, only natural gas

- 11 -

and petroleum oil. In 1961, the Kennedys' predecessors conveyed "the same interest in coal and mineral rights reserved by Madie G. Smith to Charles V. Garrison, et al, dated January 14, 1932," retaining the right to the oil and gas.

Nor are we persuaded by the Kennedys' argument that the conveyance of the right to ventilate is superfluous if the owner of the coalbed is also the owner of the coalbed methane gas. The right of ventilation has been construed as permission for the coal owner to reasonably encroach upon the estate retained by the grantor for purposes of ventilating the coal seam. *Hoge*, *supra* at 1384. Furthermore, we agree with the trial court that any distinction between a first and second conveyance is immaterial.

We find the instant case virtually indistinguishable from *Hoge*. Both involve a subdivided mineral estate with one party owning the coal and the other party owning the oil and gas. The conditions existing when the 1932 deed was executed were very much the same as those identified by the *Hoge* Court in construing that 1920 deed. Simply stated, it was just as likely that when the 1932 deed was executed in this case, the parties' reservation for oil and gas extended only to oil and natural gas. Moreover, the specific reference to natural gas in the 1932 deed undermines the Kennedys' position that the reservation of "all oil and gas" included coalbed methane. In interpreting deeds, the principle *expressio unius est exclusio alterius* applies, meaning the express mention of one thing excludes all

others. *See Fidelity Mortgage Guarantee Co. v. Boff*, 160 A. 120, 122 (Pa. 1932) (express mention of one thing in a grant implies the exclusion of another).

Since the deed reservation for oil and gas did not expressly include coalbed methane gas, which was regarded as a nuisance at the time of the conveyance, but expressly reserved the right to drill for natural gas, we find no evidence that the grantor intended to retain any right to the coalbed methane gas. Thus, we concur with the trial court that based on the *Hoge* rationale, the gas reserved was only natural gas; the coalbed methane gas was conveyed with the coal. The Kennedys' claim to the coalbed methane gas fails and judgment on the pleadings in favor of Consol on that quiet title action was proper.

Next, the Kennedys allege error in the trial court's grant of summary judgment on their claims that Consol's drills trespassed into the Kennedys' strata and converted their oil, gas and minerals for its profit. They claim that the record was sufficient to create genuine issues of material fact on the trespass and conversion claims, but that the trial court impermissibly resolved factual issues that should have been reserved for the jury.

> At the summary judgment stage, a trial court is required to take all facts of record, and all reasonable inferences therefrom, in a light most favorable to the non-moving party. This clearly includes all expert testimony and reports submitted by the non-moving party or provided during discovery; and, so long as the conclusions contained within those reports are sufficiently supported, the trial judge cannot *sua sponte* assail them in an order and opinion granting summary judgment. Contrarily, the

> trial judge must defer to those conclusions, . . . and should those conclusions be disputed, resolution of that dispute must be left to the trier of fact.

*DeArmitt v. New York Life Ins. Co.*, 73 A.3d 578, 599 (Pa.Super. 2013) (citations omitted). In reviewing a trial court's grant of summary judgment, the question of whether there exist any genuine issues of material fact is subject to a *de novo* standard of review. *Drelles v. Manufacturers Life Ins. Co.*, 881 A.2d 822, 830-31 (Pa.Super. 2005). Thus, we apply the same standard as the trial court and consider all of the evidence in the light most favorable to the Kennedys, the non-moving party. Any doubt in the existence of a genuine issue of material fact must be resolved in favor of the non-moving party. We will reverse only if there has been a clear error of law or if there are facts disclosed by the record that should have been resolved by the jury. Pa.R.C.P. 1035.2.

In support of their trespass claim, the Kennedys offered the report of David M. Falkenstern, which identified Consol's excursions underneath their property. Mr. Falkenstern opined, based upon his analysis of documents supplied by Consol, that the east leg of the well designated as B-17 was outside the Pittsburgh vein for 319 feet and that the center and west legs ran below that portion of the Pittsburgh seam known as the main bench.[4]

---

[4] The Pittsburgh or River Seam consists of the main bench, a layer of carbonaceous shale called the draw slate, and the roof coal zone.

- 14 -

Tracks one, three, six, eight and ten of the B-18 well were at times outside the Pittsburgh vein. The east leg of well B-23A was at various times below and above the Pittsburgh seam. Mr. Falkenstern concluded that, of the 23,307 feet of horizontal bore drilled on the subject property, 7,053 feet of well was located outside the Pittsburgh seam, which is 30.26% of the total bore. Report, David M. Falkenstern, 12/30/13, Exhibit G to Response to Defendants' Motion for Summary Judgment, 1/3/14. Thus, there was evidence that Consol's drills extruded into adjacent strata.

The Kennedys maintain that one can infer the necessary intent for trespass from the fact that Consol knew, both during and after drilling, that its wells were outside the Pittsburgh vein, but continued to drill through strata it did not own and did not seal off the excursions or alert the Kennedys. Appellants' brief at 38. In support of their claim that Consol knew that its wells extruded into the Kennedys' strata, the Kennedys relied upon evidence that the drillers had access to almost "real-time data" regarding the position of the drill bit based on gamma readings and drill cuttings, as well as the ability to redirect the drill bit within ten to twelve feet. The Kennedys aver that "[c]learly, Consol knew where it was drilling and, despite the ability to change course, allowed its wells to leave the Pittsburgh or River vein and enter strata owned by the Kennedys," which demonstrates "Consol's intent to be and remain in that strata." Appellant's brief at 39, citing Report of David M. Falkenstern, 12/30/13, Exhibit G to

Response to Defendants' Motion for Summary Judgment, at 45-6. According to the Kennedys, this evidence was sufficient to raise genuine issues of material fact and the trial court should have denied summary judgment. Instead, they allege that the trial court "assumed the role of arbiter of the facts." Appellants' brief at 40.

Consol directs our attention to the deed that conferred upon it the right to enter the surface and all strata for the purposes of mining and ventilating. It relies upon ***Gedekoh v. Peoples Natural Gas Co.***, 133 A.2d 283 (Pa.Super. 1957), for the proposition that, since it had a right of entry, no trespass action will lie, and that any extrusion for purposes of ventilating the coal in the Pittsburgh seam was privileged as a matter of law. The Kennedys counter that any privilege was exceeded by the mile of horizontal wells on their property, which was tantamount to a commercial gas production operation, not mere ventilation of the coal. Consol relies upon language in the 1961 Deed that conveyed to it the "uninterrupted use and enjoyment of right of way into and under said lands at such points and in such manner as may be considered proper and necessary for the advantageous and economical operation thereof." 1961 Deed.

The trial court construed the deed as conveying an easement to use as much of the original tract as necessary and convenient to ventilate and extract the coal. Thus, Consol's entry into adjacent strata for that purpose was privileged. ***Gedekoh***, ***supra***. Furthermore, the court found nothing to

suggest that Consol's profitable extraction of coalbed methane gas exceeded its privilege to engage in "advantageous and economical operation." **See** 1961 Deed. Thus, the trial court found this legal issue dispositive of the trespass claim. We concur.

It is well-settled law that in order to establish a claim for trespass, a plaintiff must prove an intentional entrance upon land in the possession of another without a privilege to do so. **See Kopka v. Bell Tel. Co.**, 91 A.2d 232, 235 (Pa. 1952); Restatement, Torts, § 164. It is unnecessary that "the actor knows or should know that he is not entitled to enter thereon." Restatement, Torts, § 163, comment b, quoted with approval in **Kopka**, **supra** at 235. "Conduct which would otherwise constitute a trespass is not a trespass if privileged." Restatement 2d of Torts, § 158, comment e.

We find merit in Consol's claim that it was privileged to enter adjacent strata by virtue of the right-of-way conveyed in the deed, and the Kennedys do not seriously dispute said that entry was privileged. Consol had a "free, uninterrupted use and enjoyment of right of way into and under" lands owned by the Kennedys. **See** 1961 Deed. The Kennedys' position that the right-of-way did not permit the commercial production of coalbed methane gas is refuted by the language of the reservation in the deed. The deed contemplated use of the right of way "in such a manner as may be considered proper and necessary for the advantageous and economical operation . . . in the digging, mining ventilating, draining and carrying away

said coal and without liability therefore." ***Id***. The fact that the degasification operation is a profitable enterprise does not exceed or run afoul of the right of way. We find this language in the deed to be legally dispositive of the Kennedys' trespass claim.[5]

Having concluded that Consol's right to enter adjacent strata in order to ventilate the coalbed methane gas negated the Kennedys' trespass claim, we turn to the Kennedys' claim that Consol converted their gas contained therein. In proving conversion, the Kennedys must prove that Consol intended to assert control over the Kennedys' gas that was inconsistent with the Kennedys' rights.[6] This Court recently reiterated our definition of conversion:

---

[5] The trial court concluded that the Kennedys, the party with the burden of proof, failed to establish the intent necessary for a *prima facie* cause of action in trespass or conversion. It noted, "the variance in gamma readings does not automatically mean that the bit is in or out of the Pittsburgh seam." Trial Court Opinion, 2/26/14, at 10. Higher readings were also consistent with the location of the bit in the roof coal zone of the Pittsburgh seam that was mostly shale and clay. The court concluded that the higher gamma readings did not equate to knowledge on the part of Consol at the time that the drill was located outside the seam in an adjacent strata. Moreover, the court declined to infer the requisite intent to trespass and convert from the facts presented, reasoning that there was little financial motivation for Consol to intentionally leave "the gas-rich Pittsburgh seam" to invade "the nearby gas[-]poor shale and clay" owned by the Kennedys. ***Id***. Although our affirmance rests on legal grounds, we agree with the trial court's view of this evidence and its refusal to draw the inference the Kennedys desired.

[6] The Kennedys alleged in their complaint that Consol had wrongfully taken or used oil, water and other minerals, as well as gas. On appeal, their argument is limited to the conversion of gas.

- 18 -

> The classic definition of conversion under Pennsylvania law is "the deprivation of another's right of property in, or use or possession of, a chattel, or other interference therewith, without the owner's consent and without lawful justification." *McKeeman v. Corestates Bank, N.A.*, 2000 PA Super 117, 751 A.2d 655, 659 n. 3 (Pa. Super. 2000). Although the exercise of control over the chattel must be intentional, the tort of conversion does not rest on proof of specific intent to commit a wrong. *Id*.

*Hranec Sheet Metal, Inc. v. Metalico Pittsburgh Inc.*, 2014 Pa. Super. LEXIS 4564, 6-7, 2014 PA Super 278 (Pa.Super. 2014) (quoting *L.B. Foster Co. v. Charles Caracciolo Steel and Metal Yard, Inc.*, 777 A.2d 1090, 1095-1096 (Pa.Super. 2001)). There is no such thing as a reckless, negligent or accidental conversion. *See* Restatement of Torts, §§ 223, comment b, and 224.

In support of their conversion claim, the Kennedys point to evidence from Jeremy Hayhurst that there was gas immediately above and below the Pittsburgh seam. Deposition of Jeremy Hayhurst, 12/10/13, at 143. Furthermore, Mr. Hayhurst confirmed that the sidetracks in adjacent strata were open cavities to which gas could migrate as it moved from an area of higher pressure to one of lower pressure. *Id*. at 277. The Kennedys charge that the trial court disregarded evidence that Consol's wells traversed through their property and that Consol did not seal those excursions. According to the Kennedys, one can reasonably infer that the Kennedys' gas migrated to the wells and was converted. At the very least, they say, the evidence raised genuine issues of material fact regarding the conversion

claim. *See Creazzo v. Medtronic, Inc.*, 903 A.2d 24 (Pa.Super. 2006) ("[A] proper grant of summary judgment depends upon an evidentiary record that either (1) shows the material facts are undisputed or (2) contains insufficient evidence of facts to make out a prima facie cause of action or defense[.]").

We agree with the Kennedys that there is evidence in the record from which one could reasonably conclude that some gas contained in their property migrated to Consol's wells and was produced. However, in order to make out a claim for conversion of that gas, it was incumbent upon the Kennedys to offer evidence of the value of the converted gas, a burden that the Kennedys acknowledge. *See* Appellants' brief at 45. The Kennedys contended below, and reiterate here, that since Consol did not differentiate the source of the gas produced, it was impossible for them to measure how much gas was produced from open wells traversing their strata.[7] They assert that the trial court should have applied the "confusion of goods doctrine" as in *Stone v. Marshall Oil Co.*, 57 A. 183, 186 (Pa. 1904) and

---

[7] We note that the Kennedys introduced some evidence of the amount of gas located in their adjacent strata. Their expert, Jeffery Dick, prepared a report in which he described the results of a canister desorption study performed on a well in West Virginia located just ten miles from the subject property. The study revealed that the stratum located directly above the Pittsburgh Seam yielded 2.37 to 4.85 standard cubic feet of gas per ton. No attempt was made, however, to value that gas.

*Gribben v. Carpenter*, 185 A. 712 (Pa. 1936), and that they are entitled to the value of the entire production of Consol's wells.

"Confusion of goods as understood in English and American law, is the wilful and fraudulent intermixture of the chattels of one person with the chattels of the other, without the consent of the latter in such a way, that they cannot be separated and distinguished." *Stone v. Marshall Oil Co.*, 57 A. 183, 186 (Pa. 1904). In *Stone*, the plaintiff sought an accounting for its share of gas profits from the lessee oil companies. The master originally found that the oil companies fraudulently confused the gas from several wells, but refused to apply the confusion of goods doctrine. The defendants maintained that it was impossible to determine what quantity was produced by a particular well as the gas from the plaintiffs' well was commingled with the gas of other wells. On appeal, this Court rejected that defense, finding that the failure to keep an account was not an innocent error on the defendants' part. The defendants fraudulently failed to keep an account despite a legal and moral obligation to pay plaintiffs one-fourth of the profits and it was impossible to approximate the quantity, although it was unquestionably a large quantity.

The *Stone* Court cited Sutherland on Damages, sec. 101, which provides: "A reasonable rule which has much authority to support it, is, that one who has confused his own property with that of other persons shall lose it when there is a concurrence of these two things: first, that he has

- 21 -

fraudulently caused the confusion, and secondly, that the rights of the other party after the confusion are not capable otherwise of complete protection." *Id*. at 186. In that case, the Court ordered that the plaintiffs receive the full amount of the profits, so that "the wrongdoer shall not profit by his wrong and the innocent party shall not suffer by it." *Id*.

In *Gribben v. Carpenter*, 185 A. 712, 713-14 (Pa. 1936), the chancellor found that defendants, the minor plaintiff's uncles, one of whom was her guardian, "conspired and colluded by manipulating, controlling and managing the leasing of plaintiff's land and a valuable producing gas well thereon, so as to deprive and defraud her of a valuable lease and the large sums of money that it would produce." Plaintiff's expert calculated her damages at seventy percent of the value of the gas sold from both wells, and the chancellor adopted this figure as the probable percentage of the gas that was produced by her well. Based on the chancellor's finding of fraudulent confusion, however, our High Court applied *Stone* and held that the plaintiff was entitled to the proceeds from the sale of gas from both wells.

Consol argues that, as *Stone* and *Gribben* illustrate, the confusion of goods doctrine applies only where a defendant commits fraud with the intent of depriving the plaintiff of his rightful proceeds. Fraud was not pled nor proved herein. Furthermore, in both *Stone* and *Gribben*, the plaintiffs offered evidence of damages, unlike the Kennedys herein. The trial court

agreed with Consol's position that **Stone** and **Gribben** were distinguishable as they involved bad faith and fraud and refused to apply the doctrine. In the absence of evidence of damages, the court entered summary judgment.

As of the filing of the motion for summary judgment, there were no fraud claims remaining in the instant lawsuit. Nor was there any allegation or proof of a contractual duty on the part of Consol to account to the Kennedys. Thus, absent from the record is evidence of the type of fraudulent intermingling of gas that would trigger the confusion of goods doctrine. On the record before us, we concur with the trial court's refusal to apply confusion of goods to remediate the Kennedys' failure to establish an ascertainable loss, a necessary element of a conversion action.[8] **See Lesoon v. Metropolitan Life Ins. Co.**, 898 A.2d 620 (Pa.Super. 2006). Summary judgment on the conversion claim was proper.

_____

[8] The trial court found the Kennedys' damages to be *de minimis*. On appeal, the Kennedys argue that the trial court erroneously based that conclusion upon the report of Consol expert Thomas Souers, which was submitted with Consol's pretrial statement and which was not part of the evidentiary record for purposes of summary judgment. Mr. Souers' report revealed that according to the same canister desorption study cited by Mr. Dick, the gas content of the Pittsburgh Seam in Greene County was 125 to 265 standard cubic feet of gas per ton, which was far in excess of the gas content of the adjacent strata. **See** footnote 7, *infra*; Defendants' Pre-Trial Statement, Exhibit A. Although the Kennedys object to the trial court's reliance upon Mr. Souers's report, we note that the Kennedys rely upon that same report in support of their contention that Consol may have drilled outside the Pittsburgh seam. **See** Appellants' brief at 38. Regardless, since we find that the confusion of goods doctrine was inapplicable herein absent fraud, the trial court's mistaken reference to this evidence is of no consequence.

The Kennedys' final issue is a challenge to the verdict in the non-jury quiet title action involving the Pittsburgh Rider seam. They claim that the trial court erred in interpreting the coal deeds as conveying both the Pittsburgh or River vein and the Pittsburgh Rider coal seam to Consol. Consol disputes the Kennedys' characterization of the trial court's findings. According to Consol, the trial court agreed with the Kennedys that the deed did not convey the Rider seam. The Kennedys could not prevail, however, because there was no evidence that the Rider seam was located under the subject property. We agree with Consol's view of the trial court's findings, and we find ample support in the record for the court's conclusions.

The Kennedys offered the testimony of Earl Kennedy, one of the plaintiffs herein, and Ann Harris, a certified professional geologist. N.T. Non-Jury Trial, 11/8/11, at 110. Earl Kennedy, although admittedly not an expert, had worked in coal mines and was familiar with the Pittsburgh Rider. Over objection, he was permitted to testify as to his understanding of the Pittsburgh Rider. He defined the Pittsburgh Rider as "a seam located above the Pittsburgh vein" and "separated in some places by several feet, some other places by a few inches." *Id*. at 22. Coal miners called it "the wild coal, rooster coal." *Id*. They would encounter it from time to time when they were drilling roof bolts. In his experience as a coal miner, the Pittsburgh Rider was not mined. *Id*. at 29. Mr. Kennedy explained that "[t]he coal above the Pittsburgh Coal on our farm, once you get through the

slate, that coal is called the -- according to the geologist it's called the Rider coal zone." *Id*. at 43-4. When it was suggested that the geologist referred to the coal above the slate as the roof coal of the Pittsburgh seam, Mr. Kennedy conceded that he had heard it "called both roof coal zone and rider coal zone." *Id*. at 44.

Ms. Harris confirmed that there is a coal seam known as the Pittsburgh Rider, and that is different from the roof coal zone of the Pittsburgh seam. *Id*. at 110, 112. The Pittsburgh Rider is not continuous and not found everywhere above a particular seam. Where it does exist, Ms. Harris posited that "it can be as much as 25, 30 feet above" the roof coal zone of the Pittsburgh seam. *Id*. at 115. However, Ms. Harris was unable to render any opinion as to whether the Rider coal seam exists on the subject property. *Id*. at 117.

The trial court noted considerable confusion between the roof coal zone of the Pittsburgh seam, also referred to as the RCZ, and the Rider coal seam. Ms. Harris largely agreed with Consol's experts that the Pittsburgh seam is composed of the main bench, a layer of carbonaceous shale called the draw slate, and the roof coal zone. *Id*. at 114-15. Consol's expert geologist, Nick Fedorko III, reviewed the geological literature dating back to 1928, which described the Pittsburgh seam as a double bed of coal consisting of a roof and a lower division separated by a clay parting. *Id*. at 137. It was his opinion that the RCZ is part of the Pittsburgh seam. *Id*. at

147. Mr. Fedorko also stated with a reasonable degree of certainty that the Rider seam is not located on the subject property. *Id*. at 153.

The trial court agreed with the Kennedys that the conveyance of the Pittsburgh seam did not include the Rider seam, but also concluded that the Rider seam was separate and distinct from the RCZ, which was the roof coal zone of the Pittsburgh seam. The court ultimately found that the Kennedys could not quiet title to the Rider seam because they failed to offer proof that the Rider seam existed on their property.

The relevant standard of review of a court's decision in a non-jury trial is as follows:

> Our review in a non-jury case is limited to "whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in the application of law." We must grant the court's findings of fact the same weight and effect as the verdict of a jury and, accordingly, may disturb the non-jury verdict only if thecourt's findings are unsupported by competent evidence or the court committed legal error that affected the outcome of the trial. It is not the role of an appellate court to pass on the credibility of witnesses; hence we will not substitute our judgment for that of the factfinder. Thus, the test we apply is "not whether we would have reached the same result on the evidence presented, but rather, after due consideration of the evidence which the trial court found credible, whether the trial court could have reasonably reached its conclusion."

*Stephan v. Waldron Elec. Heating & Cooling LLC*, 100 A.3d 660, 665 (Pa.Super. 2014) (internal citations omitted).

We have thoroughly reviewed the certified record and, viewing the evidence in the light most favorable to Consol as the verdict winner, we find no basis to disturb the non-jury verdict.

For all of the foregoing reasons, we affirm.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/22/2015