**[J-19-2016]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

**SAYLOR, C.J., EAKIN, BAER, TODD, DONOHUE, DOUGHERTY, WECHT, JJ.**

| | |
|---|---|
| FREEDOM MEDICAL SUPPLY, INC., INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | No. 8 EAP 2015 |
| | Appeal from Certification of Question of Law from the United States Court of Appeals for the Third Circuit at No. 14-1628 |
| Appellant | |
| v. | ARGUED: September 9, 2015 RESUBMITTED: January 20, 2016 |
| STATE FARM FIRE AND CASUALTY COMPANY; STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, | |
| Appellees | |

**OPINION**

**MADAME JUSTICE TODD** **DECIDED: February 16, 2016**

Section 1797(a) of the Motor Vehicle Financial Responsibility Law ("MVFRL")[1] states that a provider of medical products to automobile accident victims is entitled to reimbursement from automobile insurers, and where, as here, there is no federally-determined Medicare fee for a product, reimbursement is limited to "80% of the provider's usual and customary charge." 75 Pa.C.S. § 1797(a). The MVFRL does not define the phrase "usual and customary charge," but the Pennsylvania Department of Insurance ("Department") has promulgated regulations defining it as "[t]he charge most often made" by similarly-situated providers, 31 Pa. Code § 69.3, adding that:

> In calculating the usual and customary charge, an insurer
> **may** utilize the requested payment amount on the provider's

---

[1] 75 Pa.C.S. § 1701 *et seq.*

bill for services **or** the data collected by the carrier or intermediaries to the extent that the data is made available.[2]

31 Pa. Code § 69.43(c) (emphasis and footnote added). In this matter presented on certification from the United States Court of Appeals for the Third Circuit, we consider whether this latter language *requires* insurers to calculate a provider's usual and customary charge for a product predicated on the two bases provided for therein, or merely *permits* using those bases, among others. After careful review, we hold that it permits, but does not require, insurers to do so.

From 2010 to 2012, Appellant Freedom Medical Supply, Inc. ("Freedom"), provided electrical muscle stimulators ("EMSs") and portable whirlpools to automobile accident victims covered by Appellee State Farm Fire and Casualty Company and/or State Farm Mutual Automobile Insurance Company (collectively, "State Farm"). Notably, although Freedom purchased these items for relatively little cost, it applied significant markups. As found by the United States District Court for the Eastern District of Pennsylvania herein, Freedom purchased the EMSs for approximately $20 to $30 each, yet charged approximately $1,525 to $1,600 each, and purchased the whirlpools for approximately $40 each, yet charged approximately $525 each. Because neither the EMSs nor portable whirlpools have a federally-determined Medicare fee, Freedom sought reimbursement from State Farm for 80% of the foregoing charges.

---

[2] The "carrier" is not an insurance carrier, but, rather, an organization that contracts with the federal Health Care Financing Administration ("HCFA") to process Medicare Part B claims, and the "intermediaries" are organizations that contract with the HCFA to process Medicare Part A claims. 31 Pa. Code § 69.3. These federal contractors collect data "on Medicare procedure codes and Medicare payments," which insurers may obtain at cost. See 31 Pa. Code § 69.41. The HCFA is now known as the Centers for Medicare & Medicaid Services. See https://www.cms.gov.

State Farm, viewing Freedom's charges as excessive, conducted its own review of the usual and customary charges for the products and used its findings therein to calculate reimbursements. As described by the district court in this matter:

> First, [State Farm] conducted an individualized inquiry for each device by researching the make and model of the EMS and [w]hirlpool being dispensed. In connection with this review, [it] contacted . . . providers located in the Philadelphia area to determine their prices for both products. [It] learned that EMS models for which State Farm was being billed by providers were all of a like kind and quality, and were priced similarly.

> Next, [it] purchased EMS[s] and [w]hirlpools from providers in Berks, Bucks, Chester, Delaware, Montgomery, and Philadelphia counties in Pennsylvania, and Camden and Gloucester counties in New Jersey, to determine an average price for these devices. For the EMS[s], [State Farm] based [its] average price on the purchase of five different models from ten different sellers, including internet sources, which ranged from $93.95 to $246.95. [It] then added a six percent Pennsylvania sales tax. [State Farm] concluded that the average price for the EMS is $151.10 with 80% of that charge being $120.88. For the [w]hirlpool, [State Farm] based [its] average price on the purchase of devices from eight different providers, with prices ranging from $54.79 to $106.65. Again, [it] added a six percent Pennsylvania sales tax. [State Farm] determined that the average price for the [w]hirlpool is $97.19, with 80% of that charge being $77.75.

> Beginning in June 2010, State Farm began paying [Freedom] $120.88 and $77.75 respectively as the reimbursable amount for the EMS and [w]hirlpool, which is 80% of the usual and customary charge for each device based on [State Farm's] research and calculations.

Freedom Medical Supply, Inc. v. State Farm Fire & Cas. Co., 2014 WL 626430 at *2 (E.D. Pa. filed Feb. 18, 2014) (citations omitted).

On February 3, 2012, Freedom filed a class action on behalf of itself and similarly-situated providers in the Court of Common Pleas of Philadelphia County,

arguing, as pertinent herein, that State Farm had violated the MVFRL and 31 Pa. Code § 69.43 because its calculation of Freedom's reimbursements was not predicated on either of the two bases provided for in the regulation: (1) Freedom's requested payment amount on its bill for services; or (2) data collected by the carrier or intermediaries.[3] State Farm removed the case to United States District Court for the Eastern District of Pennsylvania, where it argued that Section 69.43(c) merely *permitted* it to make a calculation predicated on the bases provided for therein, but did not *require* it to do so, so long as its calculation was consistent with the MVFRL's other provisions and Section 69.3's definition of the "usual and customary charge" for a product.

Ultimately, the district court agreed with State Farm, and granted State Farm's motion for summary judgment on that basis. See Freedom Medical Supply, supra.[4] Observing that no Pennsylvania court had yet determined whether Section 69.43(c) was permissive or mandatory, the court found the regulation's plain language demonstrated that it was permissive. Specifically, the District Court found that the Department's use of "may," rather than "shall," in the last clause of Section 69.43(c) clearly imparted discretion on an insurer as to whether or not to make its calculation of usual and customary charges predicated on the bases provided for therein:

> Since the word "may" is not synonymous with the word "shall," which would make the use of one of the two methods

---

[3] Freedom also argued that State Farm's methodology otherwise violated the MVFRL and 31 Pa. Code § 69.3's definition of the "usual and customary charge" for a product on the ground that State Farm had selectively excluded certain similarly-situated providers who had similar charges for the products and had improperly included non-similarly-situated providers who had significantly lower charges for the products. Freedom further contended State Farm's conduct in this regard constituted negligence.

[4] The district court also found that State Farm's methodology did not otherwise violate the MVFRL and Section 69.3 or constitute negligence. Specifically, the court found that State Farm had properly considered market data in the Greater Philadelphia area and arrived at an average market price for the products at issue. Id. at *5-9.

mandatory, under a plain reading of Section 69.43, State Farm is permitted to use one of the two methods noted, but it is not required to do so. Rather, State Farm has the option to look to other provisions of the Pennsylvania Code for guidance on what is a "usual and customary charge," and is not restricted to the two means provided in Section 69.43.

Id. at *5.

Freedom appealed to the United States Court of Appeals for the Third Circuit, which, noting that no Pennsylvania court or agency has addressed the question, sought to certify it to this Court. We granted certification to answer the following question:

May an insurer use methods not specifically identified in [the MVFRL] to calculate the "usual and customary" charge for devices and services not listed on the Medicare Fee Schedule for purposes of determining the amount to be paid to providers of those devices and services?

Freedom Medical Supply, Inc. v. State Farm Fire and Casualty Co., ___ A.3d ___, 6 EM 2015 (Pa. filed Mar. 9, 2015) (order). Because the certified question is one of statutory and regulatory interpretation, a pure question of law, our standard of review is *de novo* and our scope of review is plenary. Bowling v. Office of Open Records, 75 A.3d 453, 466 (Pa. 2013).

We begin our inquiry with a brief history of recent Pennsylvania law as it pertains to the scope of a medical product provider's entitlement to reimbursement from insurers under our motor vehicle insurance laws. In 1974, the General Assembly supplanted the extant system of providing medical treatment via a fault-based insurance system, enacting the Pennsylvania No-fault Motor Vehicle Insurance Act ("No-Fault Act"), Act of July 19, 1974, P.L. 489, No. 176. The General Assembly declared the Act's purpose as establishing "at reasonable cost to the purchaser of insurance, a Statewide system of prompt and adequate basic loss benefits for motor vehicle accident victims and the survivors of deceased victims." Id. § 102(b). Pursuant to the No-Fault Act, automobile

accident victims were entitled to a certain level of coverage for "[a]llowable expense," defined as "reasonable charges incurred for, or the reasonable value of" "reasonably needed" medical and rehabilitative care. Id. §§ 103, 202. Thus, under the No-Fault Act, costs of medical products were reimbursable to providers by no-fault insurance only where their services were "reasonably needed and used" for medical purposes and only to the degree the providers' charges were "reasonable." Id.

In 1984, however, the General Assembly repealed the No-Fault Act and replaced it with the first version of the MVFRL, Act of Feb. 12, 1984, P.L. 26, No. 11 § 3, *as amended by* Act of Feb. 12, 1984, P.L. 53, No. 12 (codified at 75 Pa.C.S. §§ 1701 *et seq.*). The MVFRL abandoned the term "allowable expense" in favor of the term "[m]edical benefit," defined as "[a]ll reasonable and necessary expenses for medical treatment and rehabilitative services, including, but not limited to . . . medical supplies." 75 Pa.C.S. § 1712(1) (1984). Additionally, the MVFRL provided that a provider "shall not make a charge for . . . products . . . in excess of the amount" it "customarily charges for like . . . products . . . in cases involving no insurance." Id. § 1797(a) (1984). Thus, in repealing the No-Fault Act and enacting the first version of the MVFRL, the General Assembly retained the requirement that a provider's products be reasonably necessary and reasonably priced, and further provided that a provider could not charge a higher price under the MVFRL than it did on the open market.

Finally, in 1990, the General Assembly enacted a series of amendments to the MVFRL commonly referred to as "Act 6," Act of Feb. 7, 1990, P.L. 11, No. 6, amending Section 1712(1) to redefine "medical benefit" as follows:

> Subject to the limitations of section 1797 (relating to customary charges for treatment), coverage to provide for reasonable and necessary medical treatment and rehabilitative services, including . . . medical supplies.

75 Pa.C.S. § 1712(1) (1990).  Moreover, Act 6 modified Section 1797(a) into its current form, which reads as follows:

**§ 1797.  Customary charges for treatment**

**(a) General rule.--**A person or institution providing . . . products . . . to an injured person . . . shall not . . . request . . . payment for the . . . products . . . in excess of . . . 110% of the applicable fee schedule . . . or the **provider's usual and customary charge**, whichever is less. The General Assembly finds that the reimbursement allowances applicable in the Commonwealth under the Medicare program are an appropriate basis to calculate payment for . . . products . . . for injuries . . . .  Future changes or additions to Medicare allowances are applicable under this section. If the commissioner determines that an allowance under the Medicare program is not reasonable, he may adopt a different allowance by regulation, which allowance shall be applied against the percentage limitation in this subsection. If a . . . fee schedule . . . has not been calculated under the Medicare program for a particular . . . product . . . the amount of the payment may not exceed 80% of the **provider's usual and customary charge**.

75 Pa.C.S. § 1797(a) (emphasis added).  As referred to above, the MVFRL does not define the term "usual and customary charge."  <u>See</u> 75 Pa.C.S. § 1702.  However, the Department promulgated a regulation defining that term as "[t]he charge most often made by providers of similar training, experience and licensure for a specific . . . product or service in the geographic area where the . . . product or service is provided."  31 Pa. Code § 69.3.  Furthermore, Section 69.43(c) provides:

An insurer shall pay the provider's usual and customary charge for services rendered when the charge is less than 110% of the Medicare payment or a different allowance as may be determined under § 69.12(b) (relating to exemption from payment limitations). An insurer shall pay 80% of the provider's usual and customary charge for services rendered if no Medicare payment exists. **In calculating the usual and**

> **customary charge, an insurer may utilize the requested payment amount on the provider's bill for services or the data collected by the carrier or intermediaries to the extent that the data is made available.**

31 Pa. Code § 69.43(c) (emphasis added).

Against this backdrop, the parties' arguments are relatively straightforward. As a textual matter, and in contrast to the district court's view, Freedom argues that Section 69.43(c) provides an either/or proposition: that reimbursements must be calculated either on the basis of a provider's requested amount in its bill or on the basis of data from the carrier or intermediaries. It contends that reading Section 69.43 as merely *permitting* calculations predicated on these bases, but not excluding others that might otherwise comply with the MVFRL and Section 69.3, renders Section 69.43(c)'s language mere surplusage. Furthermore, Freedom submits that the General Assembly, in enacting Act 6, sought to depart from the uncertainty of assessing a provider's charges for "reasonableness," as under earlier statutes, and to replace it with "an objective method": "[t]reatments for which a price is found on the Medicare fee schedule are to be reimbursed at 110% of the Medicare fee schedule amount, and Non-Medicare Treatments are reimbursed at '80% of the provider's usual and customary charge.'" Freedom's Brief at 5 (quoting 75 Pa.C.S. § 1797(a)). Freedom suggests that, unless that objective method prevails, insurers will be able to engage in flawed and/or bad faith calculations of reimbursements, and providers will lack the certainty the legislature sought to provide.[5] Freedom asserts that State Farm's calculations herein

---

[5] Freedom also argues that the Department's interpretation of Section 1797(a) via Section 69.43 was upheld by the Commonwealth Court in Hospital Ass'n, Inc. v. Foster, 629 A.2d 1055 (Pa. Cmwlth. 1993), and that "[e]mbedded in the . . . interpretation is the determination that the charge most often made by similar providers was to be established by an independent entity — the Medicare contractor. Had it been appropriate for the insurance company to make the determination, it would not have established the **carrier's** data as the alternative to the specific billed amount." (continued…)

are evidence of such phenomenon, noting that its calculations led it to pay "11 different amount[s] to providers" for the subject medical products between June 2010 and January 2011, and that its reimbursement amounts counteract what it deems the MVFRL's purpose in creating "non-volatile pricing" of medical products. Freedom's Brief at 23.[6]

State Farm, by contrast, argues that Section 69.43(c) merely illustrates two possible methods of calculation. State Farm claims that the term "may" imparts discretion, particularly in contrast to the Department's use of "shall" in Section 69.43(c)'s two earlier clauses. In any event, State Farm contends that interpreting Section 69.43(c) as merely illustrative furthers the MVFRL's goals of providing coverage to automobile accident victims and containing insurance costs. State Farm's Brief at 19-20 (citing Sturkie v. Erie Ins. Co., 595 A.2d 152 (Pa. Super. 1991) (noting the MVFRL's primary aim is providing coverage to injured claimants); Pittsburgh Neurosurgery Assocs., Inc. v. Danner, 733 A.2d 1279 (Pa. Super. 1999) (noting the MVFRL's goal of containing automobile insurance costs)). State Farm submits that the potential for insurance industry chicanery is relatively low insofar as insurers must still comply with Section 69.3's definition of "usual and customary charge" — specifically, "[t]he charge most often made by providers of similar training, experience and licensure for a specific . . . product or service in the geographic area where the . . . product or service is

---

(…continued)
Freedom's Brief at 11. Freedom's argument in this regard is question-begging: the Department's intent in promulgating Section 69.43 — i.e., what is "embedded" in its interpretation — was not addressed in Foster and is the open question before this Court.

[6] We note that, although Freedom's argument is relevant in considering the proper interpretation of Section 69.43, the validity of State Farm's methodology and the legality of its payments are not before this Court.

provided." 31 Pa. Code § 69.3. Finally, State Farm notes that a ruling that Section 69.43 provides mandatory methods for reimbursement calculation could permit providers of products for which no Medicare fee applies, and for which no Medicare data has been collected, to engage in price gouging by requiring insurers to pay whatever amount such providers have billed.

The object of statutory and regulatory interpretation "is to ascertain and effectuate the intention of the General Assembly." 1 Pa.C.S. § 1921(a); id. § 1502(a)(1)(ii) (providing that the Statutory Construction Act applies to "[e]very document codified in the Pennsylvania Code except legislative, judicial, and home rule charter documents").

Because "[g]enerally, the best indicator of legislative intent is the plain language of the statute," Com., Ofc. of Governor v. Donahue, 98 A.3d 1223, 1237 (Pa. 2014), we begin by considering the plain language of the statutes or regulations at issue. See 1 Pa.C.S. § 1921(b) ("When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit."); id. § 1502(a)(1)(ii). In determining whether the language of the statutes and regulations is clear or ambiguous, we construe words and phrases "according to their common and approved usage" or, as appropriate, according to their "peculiar and appropriate" or statutorily provided meanings. 1 Pa.C.S. § 1903.

With regard to whether Section 69.43(c) *permits* or *requires* calculations of reimbursement be predicated on one of the two bases provided therein, we find the regulations at issue reasonably capable of both constructions offered by the parties. Although, as the district court reasoned, the word "may," as used in Section 69.43(c), clearly imparts discretion, the parties' dispute concerns the *objects* of that discretion. Freedom contends State Farm has the discretion to choose between the provided

bases. State Farm, on the other hand, contends it has the discretion, at its option, to choose one of those bases, or others. It notes, as the district court apprehended, that the Department could clearly have used the term "shall," as it did in the prior two clauses of Section 69.43, to unambiguously require State Farm to use one of the two bases provided for in Section 69.43, but did not. Nevertheless, the Department's use of "may" to confer discretion does not definitively detail the scope of that discretion, and nothing in the statutes or regulations at issue affirmatively forecloses either party's construction, as we find both to be reasonable views as to what Section 69.43 provides. Thus, as the language is reasonably capable of either construction, we find that it is ambiguous in this regard. Accord Meyer v. Community College of Beaver County, 93 A.3d 806, 814 (Pa. 2014).

Where statutory or regulatory language is ambiguous, this Court may resolve the ambiguity by considering, *inter alia*, the following: the occasion and necessity for the statute or regulation; the circumstances under which it was enacted; the mischief to be remedied; the object to be attained; the former law, if any, including other statutes or regulations upon the same or similar subjects; the consequences of a particular interpretation; and administrative interpretations of such statute. 1 Pa.C.S. § 1921(c). In doing so, we liberally construe statutes and regulations "to effect their objects and promote justice," 1 Pa.C.S. § 1928(c), and we presume to be erroneous any interpretation that leads to an absurd or unreasonable result, or which renders the statute ineffective or uncertain, or which favors private interests over the public interest, 1 Pa.C.S. §§ 1922(1), (4), & (5).

In our view, State Farm's argument is more persuasive. As an initial matter, we note that, since the General Assembly adopted the No-Fault Act, the law in this area consistently implicated two major policy goals: providing coverage for injured persons

and providing it at a reasonable cost to the purchaser. See No-Fault Act, § 102(b) ("[I]t is hereby declared to be the policy of the General Assembly to establish at reasonable cost to the purchaser of insurance, a Statewide system of prompt and adequate basic loss benefits for motor vehicle accident victims and the survivors of deceased victims."); see also Pittsburgh Neurosurgery Assocs., Inc., 733 A.2d at 1282 (noting that Act 6 and its amendments to 75 Pa.C.S. § 1797(a) were intended to contain medical costs so as to reduce the rising cost of purchasing motor vehicle insurance "and the resultant increase in the number of uninsured motorists driving on public highways" (internal quotation marks omitted)). Contrary to these aims, Freedom's suggested interpretation of Section 69.43 as providing exclusive methods of calculating reimbursements would permit providers of medical goods and services not contained on a Medicare fee schedule or the subject of the Medicare contractors' data to set their prices and seek reimbursement for essentially any amount they choose to bill. See 31 Pa. Code § 69.43(c) (providing that an insurer "may utilize the requested payment amount" or carrier data). That is, in the absence of a Medicare fee schedule or carrier data, an insurer would have no other option other than relying on the provider's bill. In our view, such a result could lead to the unjustified inflation of charges for medical products, exhausting accident victims' coverage limits, and potentially depriving them of benefits for further necessary medical expenses, as well as increasing automobile insurance rates.[7] In this regard, we find Freedom's interpretation beneficial to a few private interests to the detriment of the public interest, contrary to our rules of construction. Cf. 1 Pa.C.S. §§ 1921(c), 1922(1), (4), & (5).

---

[7] Although we note, as detailed supra, that Freedom has applied an exorbitant markup in its charges for the EMSs and portable whirlpools at issue herein, given the procedural posture of this case and the purely legal nature of the certified question before us, the propriety of this markup is not before us.

Freedom's interpretation is also inconsistent with the Department's definition, in Section 69.3, of "usual and customary charge" as the "charge most often made" by similar providers. As noted, under Freedom's construction of Section 69.43(c), in the absence of a Medicare fee or carrier data, reimbursements would have to be calculated based on the particular provider's bill. Of course, a particular provider's bill may be well below or well above the charge most often made by similarly-situated providers in the geographic region. Accordingly, the only way to bring Section 69.3 and Section 69.43(c) into harmony is to read the latter as *permitting* insurers to "utilize" the provider's bill or data from the carrier as a relevant, but not controlling, measure of the appropriate "usual and customary charge" for the product at issue.

Freedom's statutory history argument is also unpersuasive. As an initial matter, although Freedom appears to be correct that the legislature's adoption of Act 6 signaled a move from calculating reimbursements based on a general "reasonableness" inquiry toward one based on more objectively verifiable data, it does not follow that it potentially mandated an assessment based on whatever providers deemed an appropriate amount to bill. Indeed, although Act 6 adopted some degree of reliance on federally-provided Medicare standards (where such standards exist), nothing in the text or purpose of Act 6 indicates that, in the absence of those standards, it sought to leave insurers at the whim of providers. Indeed, the General Assembly's use of the language "usual and customary," in Section 1797, suggests that market data and industry custom will come to bear on the appropriate amount of reimbursement.

Finally, we find dubious Freedom's proposition that permitting insurers to conduct a review of market data in calculating reimbursements will lead to insurance industry chicanery and market uncertainty. As State Farm notes, even if it is not bound to calculate reimbursements predicated on the bases provided in Section 69.43(c), it must

nevertheless comply with the remainder of the MVFRL and the Department's regulations, including Section 69.3.[8] In any event, given the effects of interpreting Section 69.43(c) as potentially granting providers the right to set their own rates of reimbursement, we find Freedom's insurer manipulation concern of minor weight in comparison.

In light of the foregoing, and in answer to the question submitted, we hold that Section 69.43(c) *permits*, but does not *require*, that reimbursements be calculated predicated on the provider's bill for services or the data collected by the carrier.

Question answered. Jurisdiction relinquished.

Mr. Justice Eakin did not participate in the consideration or decision of this case.

Mr. Chief Justice Saylor, Mr. Justice Baer, Madam Justice Donohue and Messrs. Justice Dougherty and Wecht join the opinion.

---

[8] As noted *supra*, the question of whether State Farm has abided by the remaining provisions of the MVFRL, and particularly Section 69.3's definition of "usual and customary charge," is not before this Court, and we offer no view as to whether State Farm has done so.