IN THE SUPREME COURT OF PENNSYLVANIA
MIDDLE DISTRICT

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, McCAFFERY, JJ.**

| | | |
|---|---|---|
| KATHRYN J. WUNDERLY, EXECUTRIX OF THE ESTATE OF KENNETH E. WUNDERLY, DECEASED, | : | No. 119 MAP 2023 |
| | : | |
| | : | Appeal from the Order of the Superior Court at No. 2796 EDA 2022 entered on June 14, 2023 Affirming the Order of the Lehigh County Court of Common Pleas, Civil Division, at No. 2021-C-1562 entered on October 14, 2022 |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| SAINT LUKE'S HOSPITAL OF BETHLEHEM, PENNSYLVANIA D/B/A ST. LUKE'S HOSPITAL - SACRED HEART CAMPUS AND ST. LUKE'S HEALTH NETWORK, INC. D/B/A ST. LUKE'S UNIVERSITY HEALTH NETWORK AND ABOVE AND BEYOND INCORPORATED D/B/A ABOVE & BEYOND MOUNTAIN VIEW, | : | ARGUED: November 19, 2024 |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| Appellees | : | |

## OPINION

**JUSTICE MUNDY**                    **DECIDED: October 23, 2025**

### I. Introduction

Section 114 of the Mental Health Procedures Act ("MHPA") provides protection, absent willful misconduct or gross negligence, from civil and criminal liability to institutions and individuals "who participate[] in a decision that a person be examined or treated" under the Act. *See* 50 P.S. § 7114(a) ("Immunity Provision"). In this appeal, we address the scope of the term "treated" as used in the Immunity Provision, specifically whether

immunity applies where a hospital provides medical care for a physical ailment of a patient admitted to its facility for mental health treatment. For the reasons that follow, we conclude that the Superior Court properly affirmed the trial court's decision granting the hospital's motion for judgment on the pleadings under the Immunity Provision of the MHPA.

## II. Background

In June 2021, Kathryn J. Wunderly ("Appellant"), Executrix of the Estate of Kenneth E. Wunderly ("Decedent"), filed a wrongful death and survival action raising claims of negligence and corporate negligence against Saint Luke's Hospital of Bethlehem and its affiliates ("St. Luke's") related to the care and treatment of Decedent while a patient at one of its facilities. Appellant's complaint alleged that, on or about September 28, 2019, Decedent was admitted to St. Luke's with Stage I pressure ulcers to his right and left buttocks. During this hospital stay, Decedent acquired pressure related skin breakdown, pressure wounds, and the deterioration of existing pressure wounds. She further alleged that, on or around October 14, 2019, Decedent, while still a patient at St. Luke's, was documented with unstageable pressure ulcers to his right buttocks and posterior perineum, and deep tissue injury pressure wounds to his left buttocks and left heel. He was transferred to another facility, Above & Beyond, Inc.,[1] that same day and died ten days later. Appellant alleged that Decedent's pressure ulcers and wounds caused and/or contributed to his physical decline and ultimate death.

St. Luke's filed an answer with new matter, alleging that Decedent was involuntarily admitted to its facility under Section 302 of the MHPA and remained in its care under

---

[1] Appellant also asserted claims against Above & Beyond, Inc. ("Above & Beyond"), but in October 2022, both parties entered into a stipulation agreeing to dismiss Above & Beyond from the matter with prejudice. The trial court later entered an order to this effect.

Section 303.[2]  Because of this, St. Luke's asserted that, absent allegations of willful misconduct or gross negligence, it was immune from liability under the Immunity Provision of the MHPA.  Appellant, in her reply to the new matter, denied these averments as conclusions of law or mixed conclusions of law and fact that did not warrant a response. St. Luke's moved for judgment on the pleadings.

Following a hearing, the trial court granted St. Luke's motion for judgment on the pleadings.  In terms of St. Luke's conduct, the trial court explained:

> [A]ny treatment [Decedent] received for his pressure ulcers was incidental to the treatment of his dementia and mental illness.  [Decedent] was involuntarily committed to St. Luke's and treated for his aggressive and combative behavior related to his diagnosis of dementia.  The primary purpose of his hospitalization was to stabilize his mental health[.  T]he medical care he received for his pressure ulcers was coincident to that mental health treatment.  As such, St. Luke's [] [is] immune from suit unless their alleged conduct was willful or grossly negligent.

Trial Ct. Op., 3/9/22, at 9.  The trial court went on to explain that the allegations in Appellant's complaint sounded in ordinary negligence and were therefore insufficient as a matter of law to support a finding of gross negligence or willful misconduct.  The trial court therefore concluded that St. Luke's was immune from suit under the MHPA. *Id.* at 10-11.

Appellant appealed to the Superior Court, which affirmed in a unanimous, unpublished memorandum.  *See Wunderly v. Saint Luke's Hosp. of Bethlehem, Pa.*, 2796 EDA 2022, 2023 WL 3993737 (Pa. Super. filed June 14, 2023) (unpublished memorandum opinion).  Appellant raised two issues on appeal, only one of which is relevant herein.  Specifically, Appellant argued that the trial court erred in granting St.

---

[2] Section 302 allows for involuntary emergency treatment of a person who is "severely mentally ill" where certain other conditions are also met.  *See* 50 P.S. § 7302(a)-(b). Section 303 allows for extended involuntary emergency treatment, where the individual receiving involuntary emergency treatment is likely to need treatment beyond 120 hours. *See* 50 P.S. § 7303(a).

Luke's motion for judgment on the pleadings because the Immunity Provision of the MHPA does not apply. In so arguing, Appellant maintained that immunizing St. Luke's conduct under these circumstances would not advance the purposes of the MHPA. She further asserted that the treatment of Decedent's pressure ulcers did not constitute a "treatment decision" as contemplated by the MHPA.[3]

The panel began its discussion by explaining the standard applicable to a motion for judgment on the pleadings. It noted that "Pennsylvania Rule of Civil Procedure 1034 permits a party to move for judgment on the pleadings after the pleadings are closed." *Id.* at *2 (citing Pa.R.C.P. 1034). The panel further observed that it is appropriate to enter judgment on the pleadings when "there are no disputed issues of fact and the moving party is entitled to judgment as a matter of law." *Id.* (citing *Kennedy v. Consol Energy, Inc.*, 116 A.3d 626, 631 (Pa. Super. 2015) (additional citation omitted)). The panel additionally explained that it will reverse the trial court's decision to enter judgment on the pleadings "only if the trial court committed a clear error of law or if the pleadings disclose facts that should be submitted to a trier of fact." *Id.* (quoting *Kennedy*, 116 A.3d at 631). Finally, the panel noted that it accepts as true all well-pleaded allegations in the complaint. *Id.* (citing *Kennedy*, 116 A.3d at 631).

The panel then addressed Appellant's first argument that the Immunity Provision did not apply to the claims alleged in the complaint. It first explained that the MHPA immunizes facilities, physicians, and other authorized personnel from civil and criminal liability for certain decisions related to treatment, absent willful misconduct or gross negligence. *Id.* at *3 (citing 50 P.S. § 7114(a)). The panel observed that this Court has

---

[3] Appellant's second issue alleged that the trial court erred in granting St. Luke's motion for judgment on the pleadings because, even if the Immunity Provision applies, the complaint contained averments sufficient to support a finding of willful misconduct or gross negligence. *Wunderly*, 2023 WL 3993737, at *2.

defined "person" as used in Section 7114(a) to include "hospitals and other treatment facilities as well as their employees." *Id.* (quoting *Dean v. Bowling Green-Brandywine*, 225 A.3d 859, 869 (Pa. 2020)). It went on to explain that in *Allen v. Montgomery Hospital*, 696 A.2d 1175 (Pa. 1997), this Court relied upon the definitions of "adequate treatment" and "treatment" set forth in Section 104 to conclude that the Immunity Provision applies to "medical care coincident to mental health care," which is "commonly understood to include the prevention or alleviation of both physical and mental illness." *Id.* (quoting *Allen*, 696 A.2d at 1179).

The panel explained that in *Allen*, this Court found Montgomery Hospital immune under the MHPA. There, Allen received mental health treatment at Norristown State Hospital but was transferred to Montgomery Hospital for treatment of a fever and dehydration. While at Montgomery Hospital, Allen was kept in a posey restraint.[4] Before returning to Norristown State Hospital, a nurse discovered Allen hanging a few inches above the floor with the posey restraint around her neck. Allen survived but suffered permanent brain damage. *Allen*, 696 A.2d at 1176. In finding Montgomery Hospital immune from suit, this Court reasoned that the medical care provided by Montgomery Hospital was "designed to 'facilitate the recovery of a person from mental illness' under [Section 104]." *Id.* at 1179.

Here, relying on *Allen*, the panel discerned no error of law in the trial court's determination that Decedent was being treated primarily for his mental health after being involuntarily admitted for "aggressive and combative behavior related to his dementia diagnosis," and that the treatment of his pressure ulcers, similar to the restraint used in

---

[4] "A posey restraint is a vest-like restraint which is tied to the patient's bed in order to keep the patient from falling out of bed, but which allows the patient to move his or her arms and to sit up in bed." *Allen*, 696 A.2d at 1176 n.1.

*Allen*, was coincident to his mental health treatment. *Wunderly*, *supra* at *4 (citing Trial Ct. Op., 3/09/22, at 9).

### III. Issue

Appellant appealed to this Court. We granted review to consider the following issue: "Did the Superior Court err in affirming the [t]rial [c]ourt's grant of judgment on the pleadings in favor of St. Luke's [ ] because the [Immunity Provision] of the [MHPA] do[es] not apply to [Appellant]'s claims?" *Wunderly v. Saint Luke's Hosp. of Bethlehem, Pa.*, 310 A.3d 715 (Pa. 2023) (*per curiam*).

### IV. Parties' Arguments

#### A. Appellant's Argument

Appellant asserts that the Immunity Provision of the MHPA does not apply to the claims alleged in the complaint because they do not relate to the treatment provided for Decedent's mental health conditions. Appellant explains that the MHPA provides immunity to physicians and other hospital staff "who participate[] in a decision that a person be examined or treated[.]" Appellant's Brief at 14 (quoting 50 P.S. § 7114(a)). She further observes that "treatment" as defined by Section 104(a) includes "care and other services that supplement treatment and aid or promote such recovery" from mental illness. *Id.* at 15 (quoting 50 P.S. § 7104). Appellant highlights the fact that this Court has found that the MHPA is "limited by its own terms" and "does not automatically apply in every situation involving a patient with a history of mental illness." *Id.* at 14 (quoting *Dean*, 225 A.3d 859 at 871).

Appellant then discusses *Allen*, in which this Court found that the legislature did not intend "treatment" under the MHPA to be limited "to that only directly related to a patient's mental illness" but also includes treatment "coincident to mental health care," which is "commonly understood to include the prevention or alleviation of both physical

and mental illness." *Id.* at 17 (quoting *Allen*, 696 A.2d at 1179). Thus, *Allen* "concluded that limited immunity was granted to "doctors and hospitals who have undertaken the treatment of the mentally ill, including treatment for physical ailments pursuant to a contract with a mental health facility to provide such treatment.'" *Id.* (quoting *Allen*, 696 A.2d at 1179).

Appellant, attempting to distinguish *Allen*, maintains that "the offloading of pressure that [ ] [Decedent's] nursing staff should have performed in no way depended on, arose out of, or would be undertaken because of decedent's mental illness." *Id.* at 18. Nor did Decedent's injuries arise from supplemental services or medical care that would have indirectly aided in his recovery from a mental condition. *Id.* Indeed, Appellant avers that "proper offloading care would have been designed merely to promote his recovery from unrelieved pressure and pressure injuries." *Id.* Accordingly, Appellant maintains that Decedent's injuries are unrelated to any mental health treatment provided by St. Luke's to which the MHPA applies.

She additionally points out that, contrary to Allen's fever and dehydration, which were believed to have been caused by a reaction to medications used to treat her mental health condition, there is no direct connection between Decedent's pressure ulcers and his specific metal health condition. In this regard, Appellant highlights that the *Dean* Court recognized that the Immunity Provision has been applied where healthcare providers provide "medical care for physical ailments associated with treatment for primary mental illness." *Id.* at 19 (quoting *Dean*, 225 A.3d at 870). Appellant reiterates that "offloading pressure from [Decedent's] bony prominences is not 'medical care' in the same vein as contemplated by the [MHPA] and appellate precedent." *Id.*

Appellant also maintains that the failure of hospital personnel to turn and reposition Decedent altogether does not amount to a "treatment decision." She continues that,

accepting the well-pleaded facts in the complaint as true, and viewing them in the light most favorable to the nonmoving party, confirms that St. Luke's made no effort to alleviate Decedent's pressure spots, considering the type and severity of his injuries. Appellant argues that the lower courts failed to recognize the importance of such allegations. According to Appellant, the Superior Court, in affirming the trial court's decision to grant judgment on the pleadings, appears to have assumed a set of facts contrary to that alleged in the complaint. She points out that the complaint did not merely allege inadequate wound care, but rather St. Luke's wholesale failure to provide interventions like turning and repositioning.

Appellant goes on to argue that other cases interpreting and applying the MHPA are similarly distinguishable from this case. For example, in *Downey v. Crozer-Chester Medical Center*, 817 A.2d 517 (Pa. Super. 2003), Downey argued that the hospital's failure to supervise a mental health patient while bathing, which resulted in the patient drowning, was unrelated to her mental health treatment such that the Immunity Provision did not apply. The Superior Court disagreed and held that the MHPA applied "to the daily care and other services provided to a patient as part of the patient's overall psychiatric treatment[,]" and the trial court did not err in applying the Immunity Provision. *Id.* at 22-23 (quoting *Downey*, 817 A.2d at 525). Appellant claims *Downey* is unlike this case because the offloading of Decedent's pressure wounds was not related to the daily care and other services provided to him as part of his overall mental health treatment.

Appellant also points to *Farago v. Sacred Heart Hospital*, 528 A.2d 986 (Pa. Super 1987), in which Farago, who was being treated for chronic schizophrenia, was allegedly sexually assaulted by another patient after the facility determined "Farago did not require any special form of observation." *Id.* (quoting *Farago*, 528 A.2d at 986). The Superior Court found the Immunity Provision applicable, explaining that the decision to treat [ ]

Farago in an open ward with few restraints was a treatment decision[.]" *Id.* (quoting *Farago*, 528 A.2d at 988). Appellant again maintains that Decedent's need for assistance with offloading pressure was entirely unrelated to his psychiatric diagnosis, whereas Farago's assault stemmed from a treatment decision that she did not need special observation. Based on the foregoing, Appellant maintains that the Immunity Provision is inapplicable in this case.[5]

### B. St. Luke's Argument

In contrast, St. Luke's argues the Superior Court correctly determined that the MHPA's Immunity Provision applies. After recounting the relevant statutory language, St. Luke's observes that "treatment" under the MHPA has been interpreted quite broadly. St. Luke's Brief at 12. Like Appellant, St. Luke's explains that the Immunity Provision is not limited to treatment that is "directly related to a patient's mental illness" but also that which is "coincident to mental health care." *Id.* (quoting *Allen*, 696 A.2d at 1179). As such, the MHPA provides "limited immunity to doctors and hospitals who have undertaken the treatment of the mentally ill, including treatment for physical ailments." *Id.* (quoting *Allen*, 696 A.2d at 1179); *see also Dean*, 225 A.3d at 871 ("It is clear, however, the MHPA applies to treatment decisions that 'supplement' and 'aid' or 'promote' relief and recovery from 'mental illness.'"); *Farago*, 528 A.2d 988 (explaining "treatment" includes more than the initial decision to treat and examine)).

---

[5] The Pennsylvania Association for Justice ("PAJ") filed an amicus brief in support of Appellant. The PAJ argues that the Immunity Provision does not apply where there are allegations of a facility's failure to manage and treat the physical ailments of a mentally ill person committed to its care. It observes that the MHPA provides immunity for "care and other services" that "aid or promote" "the recovery from a mental illness." PAJ's Amicus Brief at 8 (quoting 50 P.S. § 7104). According to the PAJ, the MHPA does not provide immunity to St. Luke's in this case, as it failed to provide necessary care and other services for Decedent's pressure ulcers and because, in any event, the treatment of pressure ulcers does not aid or promote recovery from a mental illness. *Id.* at 4-11.

According to St. Luke's, the above-referenced language establishes that Appellant's claims are indeed barred by the MHPA for three reasons. First, St. Luke's is considered a person covered under the MHPA. Second, Decedent was indeed being treated for a mental health condition, specifically dementia. Lastly, St. Luke's provided "treatment" while Decedent was committed. It maintains that "[p]roviding a bed, and caring for bedsores, are among the most basic of accommodations, are part of a 'course of treatment designed and administered to alleviate a person's pain and distress,' and 'are necessary to maintain decent, safe and healthful living conditions.'" *Id.* at 13 (quoting 50 P.S. § 7104). Although the primary purpose of Decedent's hospitalization was stabilization of his mental health, the medical care received for his pressure ulcers was coincident to that treatment and, thus, covered by the MHPA. *Id.* at 14.

St. Luke's asserts that Appellant's arguments ignore the plain language of the MHPA. In its view, Appellant's argument that Decedent's treatment for bedsores did not depend on and was not undertaken because of his mental illness contradicts the language of the MHPA, as well as caselaw. It reiterates that "[a]ll that is needed to obtain immunity is to show that the treatment for decedent's physical conditions was part of 'a course of treatment designed and administered to alleviate a person's pain and distress,' 'facilitate the recovery' of [D]ecedent's mental illness, or, at a bare minimum, designed to 'supplement treatment and aid or promote such recovery.'" *Id.* at 14-15 (quoting 50 P.S. § 7104).

St. Luke's then explains that, contrary to Appellant's assertions, the caselaw she relies upon confirms it is entitled to immunity. St. Luke's notes that the *Allen* Court did not find the medical provider immune because Allen was secured to the bed partly because of her mental illness, but rather because "the bed and restraint constituted 'medical care designed to facilitate the recovery of a person from mental illness[.]" *Id.* at

15 (quoting *Allen*, 696 A.2d at 1179). Similarly, the Superior Court in *Downey* found the Immunity Provision applicable, reasoning the MHPA "appl[ies] to the daily care and other services provided to a patient as part of the patient's overall psychiatric treatment." *Id.* (quoting *Downey*, 817 A.2d at 525). Like both of these cases, St. Luke's avers that Decedent's care was coincident to the mental health services that it provided.

Next, St. Luke's maintains that Appellant never alleged a failure to treat, and in any event, St. Luke's did not ignore Decedent. St. Luke's asserts that Appellant's complaint takes issue with the manner in which it provided care to Decedent, not the purported failure to provide care. Indeed, St. Luke's observes that the lower courts recognized the complaint did not allege that St. Luke's provided such a lack of care. It goes on to explain that Decedent's own medical records belie the assertion that St. Luke's failed to provide care. Indeed, St. Luke's developed and implemented a plan to treat Decedent's bedsores through, *inter alia*, repositioning, applying dressings, and elevating the leg. *Id.* at 17.

St. Luke's additionally asserts that this Court has already rejected similar arguments that the failure to treat and the decision not to treat do not constitute treatment decisions. It explains that in *Farago*, Farago argued that the MHPA only applied to those acts enumerated in the statute and that her claims were based on "the hospital's complete lack of treatment" and "failure to provide a safe and secure environment." *Id.* at 18 (citing *Farago*, 562 A.2d at 304). This Court rejected that argument, finding it "much too narrow and restrictive" and determined that the hospital's decision to not provide closer supervision was nevertheless a treatment decision under the MHPA. *Id.* (citing *Farago*, 562 A.2d at 304). St. Luke's continues that the clear language of the MHPA confirms that an affirmative action is not required for a treatment decision.

Finally, St. Luke's argues that Appellant's interpretation of the MHPA as requiring a direct connection between treatment for a physical injury and recovery from mental

illness is an unworkable standard. In its view, such a standard would require courts, which are ill-equipped to make medical determinations, to assess on a case-by-case basis whether a specific treatment is directly connected with a mental health condition. St. Luke's further avers that Appellant's interpretation would thwart the purpose of the Immunity Provision by reducing the availability of mental health treatment and deter mental health providers from treating patients who exhibit signs of mental illness. *Id.* at 20-21.[6]

### C. Appellant's Reply

In reply, Appellant asserts that St. Luke's conduct does not fall under the MHPA even under its expansive definition of treatment. She asserts that leaving a patient with mobility issues, such as Decedent, "with unrelieved pressure on bony prominences only increases and aggravates pain and distress" and "does not maximize the probability of his recovery from mental illness." Appellant's Reply Brief at 3. She additionally points out that St. Luke's documentation does not reflect a treatment plan for bedsores until after they progressed in severity. *Id.* at 5-8. Because the MHPA is not triggered by the failure to provide care, Appellant argues it does not apply.

### V. Analysis

---

[6] The American Medical Association ("AMA") and the Pennsylvania Medical Society ("PAMED"), as well as the Hospital and Healthsystem Association of Pennsylvania ("HAP") filed amicus briefs in support of St. Luke's. AMA and PAMED filed a joint brief in which they raise arguments similar to St. Luke's. They additionally underscore the fact that "the MHPA does not distinguish between allegedly negligently provided treatment and alleged unprovided-but-needed treatment." AMA and PAMED Amicus Brief at 14. They also warn that Appellant's interpretation of the MHPA would improperly limit immunity and have a negative impact on mental health treatment and healthcare providers' willingness to supply the same. *Id.* at 21-23. The HAP echoes these concerns, arguing that Appellant's "direct connection" theory is untenable and would undermine the purpose of the MHPA, as many people treated for mental health have an increased risk for pressure sores. HAP Amicus Brief at 10-12. The same can be said about Appellant's treatment and failure to treat distinction. *Id.* at 14-15.

Because the question in this appeal "arises from a grant of judgment on the pleadings, our standard of review requires us to determine 'whether, on the facts averred, the law makes recovery possible.'" *Klar v. Dairy Farmers of Am., Inc.*, 300 A.3d 361, 368-69 (Pa. 2023) (citing *Cagey v. Commonwealth*, 179 A.3d 458, 463 (Pa. 2018)). We have further explained:

> [T]he same principles apply to a judgment on the pleadings as apply to a preliminary objection in the nature of a demurrer. The facts pleaded in the complaint are taken as true, along with all inferences reasonably deducible from those facts; the court should grant judgment in the defendant's favor only where the laws says with certainty that no recovery is possible; and any doubt in that regard must be resolved in favor of the non-moving party.

*Klar*, 300 A.3d at 369 n.34 (citations and quotations omitted). "Where that inquiry touches upon matters of statutory interpretation, this is a pure question of law for which our standard of review is *de novo* and our scope of review is plenary." *Klar*, 300 A.3d at 369 (citing *Franks v. State Farm Mut. Auto. Ins. Co.*, 292 A.3d 866, 871 n.9 (Pa. 2013)).

When construing a statute, we must ascertain and effectuate the intention of the legislature. 1 Pa.C.S. § 1921(a). The best indication of the legislature's intent is the plain language of a statute. *Commonwealth v. Strunk*, 325 A.3d 530, 534 (Pa. 2024) (citing *Commonwealth v. Lehman*, 311 A.3d 1034, 1044 (Pa. 2024)). "[A]s a matter of statutory interpretation, although one is admonished to listen attentively to what a statute says[;] [o]ne must also listen attentively to what it does not say." *Commonwealth v. Wright*, 14 A.3d 798, 814 (Pa. 2011). "It is only when statutory text is determined to be ambiguous that we may go beyond the text and look to other considerations to discern legislative intent." *A.S. v. Pennsylvania State Police*, 143 A.3d 896, 903 (Pa. 2016). Where we find a statute's language to be ambiguous, we may consider factors including, but not limited to, the following:

> the occasion and necessity for the statute or regulation; the circumstances under which it was enacted; the mischief to be remedied; the object to be

attained; the former law, if any, including other statutes or regulations upon the same or similar subjects; the consequences of a particular interpretation; and administrative interpretations of such statute.

*Id.* (quoting *Freedom Med. Supply, Inc. v. State Farm Fire & Cas. Co.*, 131 A.3d 977, 984 (Pa. 2016) (citing 1 Pa.C.S. § 1921(c)). "Whenever possible, a statute should be liberally construed to effectuate its object and promote justice." *Dean*, 225 A.3d at 425.

Section 114 specifically provides:

In the absence of willful misconduct or gross negligence a county administrator, a director of a facility, a physician, a peace officer or any other authorized person who participates in a decision that a person be examined or **treated** under this act, or that a person be discharged, or placed under partial hospitalization, outpatient care or leave of absence, or that the restraint upon such person be otherwise reduced, or a county administrator or other authorized person who denies an application for voluntary treatment or for involuntary emergency examination and treatment, shall not be civilly or criminally liable for such decision or for any of its consequences.

50 P.S. § 7114(a) (emphasis added).

Because Section 114 does not clearly define the term "treated," we must look elsewhere to discern its precise scope. We first recognize that "the MHPA was enacted by the [legislature] for the express purpose of providing 'procedures and treatment for the mentally ill.'" *Id.* (citing *Allen*, 696 A.2d at 1178). The MHPA sets forth the following statement of policy:

It is the policy of the Commonwealth of Pennsylvania to seek to assure the availability of adequate treatment to persons who are mentally ill, and it is the purpose of this act to establish procedures whereby this policy can be effected. The provisions of this act shall be interpreted in conformity with the principles of due process to make voluntary and involuntary treatment available where the need is great and its absence could result in serious harm to the mentally ill person or to others. Treatment on a voluntary basis shall be preferred to involuntary treatment; and in every case, the least restrictions consistent with adequate treatment shall be employed. Persons who are mentally retarded, senile, alcoholic, or drug dependent shall receive mental health treatment only if they are also diagnosed as mentally ill, but these conditions of themselves shall not be deemed to constitute mental illness.

50 P.S. § 7102.

As we explained in *Dean*, "Section 114 protects from civil and criminal liability those individuals and institutions that provide treatment to mentally ill patients, and thus promotes the statutory goal of ensuring such treatment remains available." *Dean*, 225 A.3d at 426 (citing *Farago*, 562 A.2d at 304).

Additionally, though Section 114 does not define "treated," Section 104 defines "adequate treatment" and "treatment" as follows:

> Adequate treatment means a course of treatment designed and administered to **alleviate a person's pain and distress and to maximize the probability of his recovery from mental illness.** It shall be provided to all persons in treatment who are subject to this act. It may include inpatient treatment, partial hospitalization, or outpatient treatment. **Adequate inpatient treatment shall include such accommodations, diet, heat, light, sanitary facilities, clothing, recreation, education and medical care as are necessary to maintain decent, safe and healthful living conditions.**
>
> Treatment shall include diagnosis, evaluation, therapy, or rehabilitation needed to alleviate pain and distress and to **facilitate the recovery of a person from mental illness and shall also include care and other services that supplement treatment and aid or promote such recovery**.

50 P.S. § 7104 (emphasis added). A plain reading of these definitions makes clear that the MHPA speaks of treatment quite broadly but not without limitation, considering the narrowing language also included. The scope of treatment delineated in the definitions indicates that treatment encompasses a wide array of basic care needs and other issues that may require medical treatment alongside mental health treatment.

While the specific issue in this case presents an issue of first impression, several of our decisions discussing the scope of treatment under the MHPA are instructive. We turn to a discussion of our decisions addressing Section 114 in the order in which they were decided. We begin with *Farago*. Farago, who had a history of chronic schizophrenia, was voluntarily admitted to the psychiatric unit of Sacred Heart General Hospital after experiencing an acute exacerbation of her condition. *Farago*, 562 A.2d at

301. Following an initial evaluation, hospital personnel determined that Farago did not require special observation and prescribed routine orders that included hourly physical checks. *Id.* As a result, Farago was placed in an open, co-ed ward. She later informed hospital personnel that, at some point, a fellow male patient raped her in a bathroom attached to a common area. *Id.* at 301-02. In finding the MHPA applied, this Court explained:

> [The] decision by the staff to allow [Farago] to remain in the open ward, on one hour watch, rather than on closer supervision, was in accordance with the mandates of the statute to impose the least restrictive alternatives consistent with affording the patient adequate treatment. This was a treatment decision and in the absence of willful misconduct or gross negligence it was protected under the immunity provision.

*Id.* at 304.

Several years later, this Court decided *Allen*, which is perhaps the most seminal case interpreting the Immunity Provision. The question in *Allen* was framed as "whether the immunity provisions of the [MHPA] apply to hospitals and doctors who provide medical care to a mentally ill patient pursuant to a contract with a mental hospital." *Allen*, 696 A.2d at 1175. Allen was admitted to Norristown State Hospital for long-term in-patient psychological treatment for diagnoses of psychosis and mental retardation. *Id.* at 1176. Two years later, while still under the care of Norristown State Hospital, Allen was transferred to Montgomery Hospital for treatment of a fever and dehydration. Both of these physical ailments were believed to be a reaction to medication prescribed by Norristown State Hospital and used to treat Allen's mental illness. *Id.* While at Montgomery Hospital, Allen, whose psychosis made her difficult to control, was restrained with a posey vest. The posey vest was tied to the bed to prevent Allen from falling. *Id.* Allen was later discovered by hospital staff hanging from her bed several inches above the floor with the posey vest around her neck. She suffered brain damage due to lack of oxygen. *Id.* Allen's parents later filed suit against the hospital and treating physician for

medical negligence. *Id.* at 1177. This Court determined that both the hospital and the treating physician were immune from suit under Section 114 because Allen, who was mentally ill, was admitted to Montgomery Hospital "in acute need of medical care" and was provided this medical care "designed to 'facilitate the recovery of a person from mental illness' under [Section 104]." *Allen*, at 1179 (quoting 50 P.S. § 7104).

The Superior Court later applied *Allen* to its decision in *Downey v. Crozer-Chester Medical Center*, 817 A.2d 517 (Pa. Super. 2003). Downey had suffered from mental illness for many years. At one point, Downey was diagnosed with organic mood disorder, bipolar type and, as a result, was involuntarily committed to Crozer-Chester Medical Center ("Crozer") for treatment. *Id.* at 521-22. Downey, as a result of her mental condition, required direct supervision of daily living activities and assistance with bathing. *Id.* at 522. While at Crozer, Downey accidentally drowned after bathing without direct supervision. *Id.* The Superior Court found Crozer was immune from suit because the MHPA applies "to the daily care and other services provided to a patient as part of the patient's overall psychiatric treatment[,]" and Downey "failed to adduce sufficient evidence on the issue of gross negligence[.]" *Id.* at 525, 529 (quoting *Allen*, 696 A.2d at 1179). The Superior Court therefore affirmed the trial court's order granting summary judgment in favor of Crozer. *Id.* at 529.

Decedent was unquestionably being treated by St. Luke's for a mental health condition. He was involuntarily admitted to St. Luke's under Section 302 for dementia-related aggression and remained in its care under Section 303. Notwithstanding, Appellant maintains that the MHPA does not apply because the claims alleged in the complaint do not relate to the treatment of Decedent's mental health conditions. We disagree. At the outset, the definitions of "adequate treatment" and "treatment" provided in Section 104 make clear that the MHPA applies to various aspects of care. "Adequate

treatment" is defined, in part, as that which is "designed and administered to alleviate a person's pain and distress" and "maximize the probability of [the patient's] recovery from mental illness." 50 P.S. § 7104. Where inpatient treatment is involved, the definition includes accommodations such as "diet, heat, light, sanitary facilities, clothing, recreation, education and **medical care as are necessary to maintain decedent, safe and healthful living conditions**." *Id.* (emphasis added). "Treatment" includes direct care of a mental illness, as well as "care and other services that supplement treatment and aid or promote such recovery [from a mental illness]." *Id.* As noted above, these definitions make clear that treatment under the Immunity Provision encompasses not only that which is specifically directed toward recovery from a mental illness, but also basic care needs and other foreseeable medical issues that may or may not directly relate to mental health treatment but require attention during the patient's admission.

Indeed, *Allen* examined these definitions and specifically determined that the MHPA does not limit treatment to that which is directly related to a patient's mental illness. *Allen*, 696 A.2d at 1179. Relying on the definitions of "adequate treatment" and "treatment" in Section 104, the *Allen* Court opined that the legislature intended a broader meaning of treatment that includes medical care "coincident to mental health care" as well as "'care and other services that supplement treatment' in order to promote the recovery of the patient from mental illness." *Id.* (citing 50 P.S. § 7104). *Allen* reasoned that such an interpretation of treatment serves the legislature's purpose of the MHPA by "ameliorat[ing] certain risks by granting limited immunity to doctors and hospitals who have undertaken the treatment of the mentally ill, including treatment for physical ailments pursuant to a contract with a mental health facility to provide such treatment." *Id.* at 1179.

In this regard, *Allen* cautioned that construing the provisions narrowly to treatment specifically directed at a mental illness could "reduce or eliminate the willingness of

doctors or hospitals to provide needed medical care to a mentally ill patient who is referred by a mental hospital for medical treatment." *Id.* *Allen* further explained that "[e]ven if doctors or hospitals still provided treatment for physical ailments in such a situation, it could lead such providers of medical care to minimize their risks by placing the mentally ill patients in a more restrictive environment than is necessary or adopting other precautionary measures which would increase the costs of the medical care provided to the mentally ill." *Id.*

We find this case comparable to *Allen* where the MHPA Immunity Provision was held to apply. Allen, who suffered from psychosis and mental retardation, was receiving coincident treatment for the physical ailments of fever and dehydration when physically injured by a restraint due to the hospital's alleged negligence. *Id.* Similarly, Decedent "was involuntarily committed to St. Luke's and treated for his aggressive and combative behavior related to his diagnosis of dementia." Trial Ct. Op., 3/09/22, at 9 (citing St. Luke's Answer and New Matter, ¶ 71 and Exhibit A). While being stabilized for the same, Decedent required coincident treatment for pressure ulcers. It is worthy of mention that the hospital records reveal a level of difficulty in treating Decedent for his pressure wounds due to his mental state.[7] *See* Answer with New Matter, 9/1/2021 at ¶ 71, Exhibit A. Such difficulties are certainly to be expected when treating those with mental illness, which is one of the reasons the MHPA provides healthcare providers with a degree of latitude in order to ensure that mental health treatment remains available. *Dean*, 225 A.3d at 426 (citation omitted). We therefore find unpersuasive Appellant's attempt to distinguish *Allen* by arguing that "the offloading of pressure that [ ] [Decedent's] nursing staff should have performed in no way depended on, arose out of, or would be undertaken

---

[7] These records include notations stating that Decedent was, at times, combative and non-compliant with attempts by hospital personnel to implement treatment measures for bedsores, even removing the boot used to relieve heel pressure. *See id.*

because of decedent's mental illness."[8]  Appellant's Brief at 18.

Simply put, *Allen* does not establish any such requirement, only that the care at issue be "coincident" to the mental health treatment.  *Allen*, 696 A.2d at 1179.  In fact, the *Allen* Court's rationale disproves this theory.  *Allen* warned that interpreting treatment to apply to that specifically directed at a mental illness could lead providers of medical care "to minimize their risks by placing the mentally ill patients in a more restrictive environment than is necessary or adopting other precautionary measures which would increase the costs of the medical care provided to the mentally ill."  *Id.*  Here, St. Luke's treatment of Decedent's pressure wounds was certainly coincident to his mental health treatment under the statutory definitions of "treatment" and "adequate treatment," as it was "needed to alleviate pain and distress and to facilitate the recovery of a person from mental illness."

---

[8] In a similar vein, the dissent criticizes our interpretation of Section 114(a) as broadly extending "immunity to encompass any 'coincident' treatment regardless of whether there was a link between the mental health and physical care."  Dissenting Op., Donohue, J., at 2.  The dissent maintains that our understanding of "coincident" is inconsistent with *Allen*, which "stands for the proposition that a hospital is immunized for supplemental care that **arises** from a patient's treatment for mental illness."  *Id.* at 3 (emphasis added).  We disagree.  The dissent, like Appellant, advances the same direct link theory rejected in *Allen*.  Indeed, the statutory definitions of treatment and adequate treatment make clear the Immunity Provision encompasses far more than the mental health care itself or those issues that arise as a direct result.

The dissent suggests we are treating the mentally ill as a disfavored class who are not entitled to advance medical negligence claims solely due to their mental illness.  We note, however, that our holding is based on our understanding of scope of the statutory immunity granted by the MHPA.  Speaking to the dissent's concerns, we concluded in *Allen* that distinct legislative treatment along these lines does not violate equal protection.  We observed, in particular, that mentally ill patients require "more specialized or intensive care than the non-mentally ill," and that the legislative classification and civil immunity granted to those treating such patients serves the "important government interest" of ensuring they receive adequate treatment in the least restrictive manner consistent with their medical needs.  *Allen*, 696 A.2d at 1179 n.7.  Ultimately, trial courts will be tasked with making threshold determinations about whether treatment is coincident based on the specific facts of a case.  Moreover, the General Assembly's intended reach of Section 114 is clear and it is not our role to preemptively cure any unforeseen or unsavory result stemming from its plain meaning.

50 P.S. § 7104.[9]  It was also most certainly "necessary to maintain decent, safe, and healthful living conditions." *Id.*

To the extent Appellant alternatively argues that St. Luke's conduct does not constitute treatment due to its wholesale failure to follow through with its treatment plan, we similarly disagree, as this position is belied by the record.  Decedent was admitted to St. Luke's on September 28, 2019, after demonstrating dementia-related aggression. *See* Answer with New Matter, 9/1/2021 at ¶ 71, Exhibit A.    On October 8, 2019, while being assisted to the bathroom, hospital personnel observed Decedent grimacing and avoiding bearing his full weight.  They assessed Decedent and discovered an "intact fluid filled blister on [his] left heel." *Id.*  The following day, Decedent was seen by a physician for a wound care consult.  The consulting physician noted several pressure ulcers, including the left buttocks, right buttocks, and left heel, and developed a treatment plan to offload pressure from these areas. *Id.*  After this point, Decedent's medical records indicate that, pursuant to this plan, hospital personnel took various measures including, but not limited to, applying dressings and barrier creams, as well as ambulating and elevation. *Id.*  Accordingly, Appellant cannot say that St. Lukes failed to provide any treatment to Decedent for pressure ulcers.

Even if this were the case, St. Luke's correctly observes that this Court specifically declined to find that such failures do not qualify as treatment in *Farago*. *See Farago*, 562 A.2d at 305 (rejecting argument that "complete lack of treatment" and "failure to provide a safe and secure environment" was not a treatment decision under Section 114). Moreover, Section 114 does not distinguish between negligent acts or omissions; and

---

[9] Though we reject Appellant's argument that there must be a direct link between a patient's mental illness and treatment provided, this Court does not conclude that St. Luke's treatment of Decedent's pressure ulcers was not directly related to his mental health treatment.

ordinary negligence is understood to encompass both negligent acts and omissions. *See Feleccia v. Lackawanna Coll.*, 215 A.3d 3, 30 (Pa. 2019) (Wecht, J., concurring) ("The conduct at issue in any negligence case is the 'act or omission upon which liability is asserted.'" (quoting *Walters v. UPMC Presbyterian Shadyside*, 187 A.3d 214, 234 (Pa. 2018)).

As a final note, today's decision should not be interpreted as immunizing virtually all medical treatment provided to a patient with mental health issues. The MHPA limits immunity to medical treatment that is coincident to mental health treatment. While it is difficult to enounce specific parameters given the fact-specific nature of these cases, there will be circumstances where medical treatment is so tenuously connected to the mental health treatment that the Immunity Provision does not apply. The definitions of "treatment" and "adequate treatment" are broad but not without limitation. Here, we have determined that St. Luke's actions regarding Decedent's pressure ulcers constituted treatment under the MHPA, as it was "coincident" to his mental health treatment for dementia. Pressure ulcers, in particular, are a rather foreseeable complication during an elderly patient's inpatient treatment for a mental health condition and one that is consistent with the scope of the term "treated" under the Immunity Provision. We trust that our trial courts will similarly be able to discern whether the treatment of other physical ailments is coincident or not based on the specific facts of a case.

Because St. Luke's conduct in this case qualifies as treatment, St. Luke's may not be held liable under the Immunity Provision of the MHPA absent willful misconduct or gross negligence. Appellant has failed to make any such allegations in the complaint, and the Superior Court affirmed the trial court's decision concluding that the allegations in the complaint sounded in ordinary negligence and were insufficient as a matter of law to support a finding of gross negligence or of willful conduct. Moreover, this specific issue

was not included in this Court's order granting allocatur. We agree with the Superior Court's decision finding judgment on the pleadings proper.

## VI. Conclusion

For the foregoing reasons, this Court concludes that St. Luke's actions in this case qualify as treatment under the MHPA. Because Appellant failed to demonstrate gross negligence or willful indifference, St. Luke's is immune from suit. We therefore affirm the order of the Superior Court granting St. Luke's motion for judgment on the pleadings.

Chief Justice Todd and Justices Wecht and Brobson join the opinion.

Justice Donohue files a dissenting opinion in which Justices Dougherty and McCaffery join.